# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 29, 2010

No. 08-40840

Lyle W. Cayce
Clerk

In the Matter of:  MOOSE OIL & GAS CO; MOOSE OPERATING COMPANY INC,

      Debtors

---

O LEE TAWES, III

          Appellant

v.

DORIS BARNES, Individually and as Independent Executrix of the Estate of Leon McNair Barnes, Deceased

          Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before GARWOOD, SMITH, and CLEMENT, Circuit Judges.

PER CURIAM:

As stated below, this case involves important and determinative questions of Texas law as to which there is no controlling Texas Supreme Court precedent. Accordingly, we certify those unresolved questions to the Supreme Court of Texas.

No. 08-40840

CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT TO THE SUPREME COURT OF TEXAS, PURSUANT TO THE TEXAS CONSTITUTION ART. 5, § 3-C AND TEXAS RULE OF APPELLATE PROCEDURE 58.1.

TO THE SUPREME COURT OF TEXAS AND THE HONORABLE JUSTICES THEREOF:

## I. Parties & Counsel

The Style of the case is *O Lee Tawes, III, Appellant, v. Doris Barnes, Individually and as Independent Executrix of the Estate of Leon McNair Barnes, Deceased, Appellee*, No. 08-40840, in the United States Court of Appeals for the Fifth Circuit, an appeal by appellant O. Lee Tawes, III, from the judgment of the United States District Court for the Southern District of Texas, Victoria Division, affirming in part and reversing in part the November 2009 judgment of the United States Bankruptcy Court for the Southern District of Texas in the adversary proceeding, styled *Doris Barnes v. Marlin Data Research, Inc., et al*, pending in the bankruptcy proceeding in said court styled *In the Matter of: Moose Oil & Gas Co; Moose Operating Company Inc., Debtors.*

The appellant, O Lee Tawes, III, is represented by Barnet B. Skelton, Jr. of Barnet B. Skelton, Jr. P.C., 1111 Bagby St., 47th Floor, Houston, Texas 77002, Tel. 713-659-8761. Doris Barnes, the appellee, is represented by Tom Kirkendall of the Law Office of Tom Kirkendall, 2 Violetta Ct., The Woodlands, Texas 77381-4450, Tel. 281-364-9946 and Dick Watt, of Watt Beckworth Thompson & Henneman, LLP, 711 Louisiana St., 1800 South Tower, Houston, Texas 77002, Tel. 713-650-8100.

## II.  Statement of the Case

This case involves the construction and application of the hereinbelow identified Texas oil and gas Working Interest Unit Agreement and Joint Operating Agreement.

2

No. 08-40840

## A. *The Leases, Lessors, & Lessees*

In 1996, Moose Oil & Gas Company (Moose O&G) acquired oil, gas and mineral leases in Lavaca County, Texas. Moose O&G assigned some of its lease interests to a group of investors (the Moose Assignees), including appellant herein O. Lee Tawes, III (Tawes). Collectively, these lands will be referred to as the Baker Lease.

Also in 1996, American Exploration Company acquired from Leon Barnes and Doris Barnes (appellee herein individually and as executrix of the estate of Leon Barnes, deceased) an oil, gas and mineral lease (the Barnes Lease). The Barnes Lease covered 345.5 acres of property adjacent to the Baker Lease. Ultimately, American Exploration Company's interest in this lease was passed to Louis Dreyfus Natural Gas Corporation, which interest in turn later passed to Dominion Oklahoma Texas Exploration and Production, Inc. (collectively Dominion).

In July 1998, Moose O&G, the Moose Assignees, Dominion and Seisgen Exploration Inc. (Seisgen) pooled their interests in the oil, gas and mineral leases discussed above.[1] Of the 640 total acres in the pooled unit, the Barnes lease constituted 54% of the land. Each of these parties agreed to be bound by the terms of a Working Interest Unit Agreement (WIUA) and an attached Joint Operating Agreement (JOA). Dominion later acquired Seisgen's interest.

The WIUA designated Dominion as the operator of any wells that would be drilled on the pooled unit. Dominion drilled and operated wells on the pooled unit. Moose O&G proposed to drill two additional wells that would have their surface location on the Baker Lease, but would directionally extend to bottom

---

[1] At the time, the Barnes Lease contained an express no-pooling clause. Dreyfus, Dominion's predecessor in interest, obtained a pooling agreement from Barnes in exchange for $125,000, access to 3D seismic test results, and the release of certain shallow rights from the Barnes' lease.

No. 08-40840

out under the Barnes Lease.  The contracts allowed Dominion to not participate in the drilling of these wells if it chose to go "non-consent."  For a certain "non-consent" period under the contract, Dominion would not receive any revenues from production, nor would it incur liabilities in drilling and maintaining the wells.

Dominion elected to go "non-consent" on the proposed wells.  Moose O&G decided to and did drill and operate these two wells (designated Baker-Barnes Nos. 1 & 2) anyway.  Moose O&G and the Moose Assignees, including Tawes, were Consenting Parties under the WIUA and JOA.  At all herein relevant times, Moose O&G was the operator of the Baker-Barnes Nos. 1 & 2 wells.

## B.  The Working Interest Unit Agreement

At issue in this case is Tawes' liability, as a Consenting Party, for royalty respecting production  from the Baker-Barnes 1 & 2 wells under the WIUA and JOA.  The WIUA, in a section titled "Lease Burdens," provided:

> "Each Party hereto shall bear and be responsible for their own lease burdens including, but not limited to their Lessor's royalty, overriding royalty along with any and all other royalty burdens which may have been created by the party contributing the lease or leases to this Working Interest Unit."

Further, in a section titled "Provision V," it also provided that:

> "Moose Oil & Gas Company shall be the liable party to the Operator for the entire forty-six percent (46%) working interest within the Working Interest Unit for the parties hereinabove referred to as Moose [including Tawes]. Moose Oil & Gas Company shall be the responsible party, for each of said parties, to the Operator for obtaining and delivering any and all elections, notices, invoices payments and billings.

> Should one or more Moose parties decide not to participate in a proposed operation, the participating Moose party or parties shall have the option of disbursing the non-participating Moose parties interest proportionately among the participating Moose parties."

Finally, in an section titled "Lease Rentals," the WIUA stated:

4

No. 08-40840

"Rentals, shut-in payments, or minimum royalties which may become due on leases committed hereto shall be paid by the contributor of the lease to the Working Interest Unit. It is the obligation of the contributing Lessee to maintain its own lease or Leases subject to this Agreement."

The parties agreed in the WIUA that it would be "governed by" the JOA that was attached as an exhibit to the WIUA.

## C.  *The Joint Operating Agreement*

The JOA, in its Article III.B, set out a general scheme of liability apportionment:

"Unless changed by other provisions, all costs and liabilities incurred  in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in [the WIUA].  In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of their interests which shall be borne as hereinafter set forth.

Regardless of which party has contributed the lease(s) and/or oil and gas interest(s) hereto on which royalty is due and payable, each party entitled to receive a share of production of oil and gas from the Contract Area shall bear and shall pay or deliver, or cause to be paid or delivered, to the extent of its interest in such production, the royalty amount stipulated hereinabove and shall hold the other parties free from any liability therefor.  No party shall ever be responsible, however, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if any such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected lease shall bear the additional royalty burden attributable to such higher price."

After thus setting out the relationship between the parties generally, the JOA then specifically addressed the situation where a signatory did not want to take part in a proposed well drilling operation.  If a party did not consent to the drilling of a proposed well, the JOA gives Consenting Parties the right to drill anyway and lays out the rights and obligations of the consenting parties.  Article

I of the JOA also defined the terms "consenting party" and "non-consenting party":

> "The terms 'Drilling Party' and 'Consenting Party' shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement. . . .

> The terms 'Non-Drilling Party' and 'Non-Consenting Party' shall mean a party who elects not to participate in a proposed operation."

The JOA states in its Article VI.B2, "[t]he entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear. . . ." Finally, in a subsequent portion of its Article VI the JOA contains the statement that:

> "During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production . . . ."

This JOA provision, which for convenience of identification *we* call the "Royalty Provision," is the language principally at issue here. Barnes argues that Tawes, as a Consenting Party, is responsible for "all royalty" owed to her.

### D. The Resulting Lawsuit

In 2000, Barnes sued Dominion and Moose O&G in Lavaca County, Texas district court to recover damages to real property, breach of contract for failure to pay royalties, fraudulent inducement, and negligent misrepresentation. Tawes and the other Moose Assignees were originally brought into the suit as third-party defendants. Under her original contract with Dominion, Barnes was owed a 17.916% royalty. No party, including Tawes, disputes that Barnes was owed a royalty proportional to her land's contribution to the pooled unit, or 9.675%. The remaining 8.241% (17.916-9.675) was disputed between the parties.

No. 08-40840

In February of 2002, Tawes and Marlin Data Research, Inc. (MDR)[2] acquired Moose O&G's working interest in the Baker Lease and the Baker-Barnes Nos. 1 & 2 wells at a foreclosure sale. The following chart displays the working interest ownership of the wells at issue:

|  | Tawes | | MDR | |
| --- | --- | --- | --- | --- |
| Baker-Barnes Wells: | Well 1 | Well 2 | Well 1 | Well 2 |
| Before Feb. 13, 2002: | 12.5% | 13.1146% | 0% | 0% |
| After Feb. 13, 2002: | 40.901324% | 41.023051% | 10.451376% | 10.258449% |

In March of 2002, payout of the proceeds received from the sale of production from the Baker-Barnes Nos. 1 & 2 wells was suspended and such proceeds began to be held in suspense pursuant to court order. The production payments are held in two accounts: one for the benefit of the working interests, including Tawes, based on their respective interests in the wells, and another for the benefit of all the royalty owners.

In April of 2002, Moose O&G filed in the bankruptcy court a voluntary bankruptcy petition under Chapter 7 of Title 11 of the United States Code. In August, notice of removal was filed, removing the Barnes' state-court action to the bankruptcy court below as part of the Moose O&G bankruptcy proceeding.

In September of 2003, the parties notified the bankruptcy court that a settlement had been reached among Barnes, Dominion, and the Moose Assignees, but not Tawes or MDR. Under the terms of the settlement, Barnes would receive $356,124.96. Barnes agreed to ratify her royalty to the undisputed 9.675% in all the wells in the pooled unit and release her claims against the parties to the settlement agreement. Dominion agreed to release its third-party claims against the Moose Assignee signatories to the settlement agreement. The bankruptcy court issued a Final Case Management Order directing all non-

---

[2] MDR is a Texas Corporation that is owned by John F. Terwilliger, the former CEO and majority owner of Moose O&G.

7

settling parties to file amended pleadings and a stipulation of facts and law. Barnes amended her complaint to allege that Tawes and MDR were responsible for royalties due from Baker-Barnes Nos. 1 and 2 wells that accrued prior to February 2002. In October 2004, the bankruptcy court approved the settlement.

In August of 2006, the bankruptcy court found Tawes, but not MDR, liable to Barnes for unpaid royalties on the Barnes Nos. 1 and No. 2 wells that accrued from the date of first production to February 2002. Specifically, the bankruptcy court relied on the above-noted Royalty Provision of the JOA stating that Consenting Parties shall be responsible for "all royalty" applicable to the non-Consenting Party's share of production. However, the bankruptcy court found no evidence that Barnes was owed 17.916% royalty. Instead, the bankruptcy court held that Barnes was owed royalty proportional to her land's contribution to the pooled unit, or 9.675%—the undisputed royalty amount. The bankruptcy court held that Barnes' damages, $291,846, should not be offset by her settlement with Dominion and the other Moose Assignees because the evidence does not establish which portion of the settlement, if any, was payment of the pre-February 2002 royalties, as opposed to post-February 2002 royalties or damages for her claims of fraudulent inducement and negligent misrepresentation.[3] Finally, the bankruptcy court rejected Barnes' claim for attorneys fees.

Tawes appealed the bankruptcy court's decision to the United States District Court for the Southern District of Texas. Barnes cross appealed the bankruptcy court's decision on attorneys fees. The district court affirmed the bankruptcy court's holding as to liability, but reversed its decision on attorneys fees and remanded it for factual development. The district court compared *MCI Telecommunications Corp. v. Texas Utilities Electric Co.*, 995 S.W.2d 647 (Tex.

---

[3] The bankruptcy court held that Tawes did not establish proof by a preponderance of the evidence that Barnes' damages should be offset by the Dominion settlement.

1999), with *Stine v. Stewart*, 80 S.W.3d 586 (Tex. 2002), and held that Barnes was a third-party beneficiary of the WIUA and JOA. Interpreting the contract under Texas law, the district court held that the contract did not preclude recovery against Barnes. Finally, it held that the Non-Consenting Parties had bargained for the consenting parties to be fully liable for all royalties due by a Non-Consenting Party.

## III. Legal Issues

### A. *Barnes Rights Under the WIUA and JOA*

As an initial matter, Tawes argues that the lower courts erred in holding that Barnes was a third-party beneficiary to the WIUA and the JOA. He claims that the JOA was not intended to be for the benefit of lessors and as a result, under Texas law, the JOA created no third-party liability.

Under our reading of Texas law, a contract creates a third-party creditor beneficiary only if the signatories (l) intended to confer a benefit on that third-party and (2) entered the contract to confer that benefit on the third party. *MCI Telecomm. Corp.*, 995 S.W.2d at 651. The language of the contract must be clear, and the intent of the contracting parties controls. *Id.* "[A] presumption exists that parties contracted for themselves unless it 'clearly appears' that they intended a third party to benefit from the contract." *Id.* For this purpose, there seems to be a distinction between direct or express benefit, on the one hand, and incidental benefit on the other hand. *Stine*, 80 S.W.3d at 586. That a contract incidentally benefits some third party is insufficient to establish an intent to create a third-party beneficiary. *Id.* The would-be third-party beneficiary has the burden of proof on this issue. *MCI Telecomm. Corp.*, 995 S.W.2d at 651.

The instant case seems to fall somewhere between *Stine* and *MCI Telecommunications.* In *Stine,* the would-be beneficiary was named in a couple's divorce agreement as a creditor to whom a debt was owed. *Stine*, 80 S.W.3d at 588. The divorce agreement also clearly defined the terms of the repayment due

No. 08-40840

to the beneficiary. *Id.* The court noted that the divorce agreement was not *solely* intended to provide for repayment of the would-be beneficiary. *Id.* at 591. But the court held that express references to the beneficiary and the clear intent to ensure her repayment created more than an incidental benefit, and was sufficient to make her a third-party creditor beneficiary under the terms of the divorce agreement. *Id.* at 591–92.

In *MCI*, however, that company sought to install fiber optic cable along a railroad right-of-way. *MCI Telecomm. Corp.*, 995 S.W.2d at 648–49. Years before, Texas Utilities had installed transmission poles along that same right-of-way. MCI contractually agreed with the railroad to "secure such permission as may be necessary on account of any other existing rights in any third party (including, without limitation, rights of . . . licensees[) and] MCI hereby agrees to exercise the herein granted rights in such a manner as not to interfere in any way with any existing prior rights." *Id.* at 649. Texas Utilities claimed MCI's work damaged its transmission poles and sought to enforce its rights as a third-party creditor beneficiary under MCI's contract with the railroad. *Id.* The court in *MCI* held that the contract created no third-party beneficiary rights for licensees. *Id.* at 652. As in *MCI*, the JOA identifies a specific group of royalty owners that Barnes argues have third-party beneficiary rights.

While the *MCI* contract seemingly identifies a definite group of potential third-party beneficiaries, an arguably significant difference between *Stine* and *MCI* may be that the *MCI* contract does not identify *what* rights of the class are to be respected. Unlike *MCI*, but like *Stine*, the contract here identifies a specific, limited group of individuals and identifies what rights are owed to the those individuals (payment of royalties). Further, in *MCI*, there was particular language in the contract that explicitly stated that the contract was not to be interpreted as conferring any benefits on non-signatory parties. *Id.* In fact,

10

No. 08-40840

opinions in some Texas cases state that *MCI* turned on that express language in the contract. *E.g.*, *Pratt-Shaw v. Pilgrim's Pride Corp.*, 122 S.W.3d 825, 831 (Tex. App.—Dallas 2003, pet. denied). No party has asserted that such a clause exists in either the WIUA or the JOA.

Barnes also makes an alternative argument that even if she is not a third-party creditor beneficiary, she has a basis of recovery against Tawes because they are in privity of estate. "Liability to the original lessor for the payment of rent or the performance of other lease covenants may arise from either privity of contract or privity of estate." *Amco Trust Inc. v. Naylor*, 159 Tex. 146, 149–50, 317 S.W.2d 47, 50 (1958). She argues that Tawes came into privity of estate with her by undertaking the obligation to pay royalty under the Barnes Lease. She further argues that when Tawes increased his interest in the Baker-Barnes Nos. 1 & 2 wells by acquiring a portion of Moose O&G's working interest, Tawes stepped into Moose O&G's privity of estate with Barnes and undertook the same obligation as Dominion to pay Barnes' royalty.

## B. *Contractual Bar to Recovery*

Tawes contends that even if Barnes is a third-party creditor beneficiary, she cannot enforce her rights against Tawes because Dominion, Barnes' lessee, could not have enforced the Royalty Provision against Tawes. As Moose O&G was the party liable to Dominion on behalf of Tawes, Tawes claims the above-quoted Provision V[4] of the WIUA insulated him from liability. Tawes' contention implies that Dominion would only be able to recover from Moose O&G for a breach of the WIUA so the same is true for Barnes. Barnes can have no greater rights to reach Tawes than did Dominion, Tawes contends.

---

[4] "Moose Oil & Gas Company shall be the liable party to the Operator for the entire forty-six percent (46%) working interest within the Working Interest Unit for the parties hereinabove referred to as Moose."

No. 08-40840

As an initial matter, the Royalty Provision on which Barnes relies is contained in the JOA, while Provision V on which Tawes relies is contained in the WIUA. If Barnes is a third-party creditor beneficiary of the JOA, she arguably has individual standing to assert her rights thereunder. Her third-party beneficiary status relies on her lease to Dominion, however, so Dominion's rights under the contracts are relevant. In short, if Dominion could hold Tawes liable for breach of the JOA's Royalty Provision, and Barnes is a third-party beneficiary of the JOA, then she too, arguably could hold Tawes liable for breach of the JOA's Royalty Provision. The question then would appear to be whether Dominion could have held Tawes liable—separately from Moose—for a breach of the Royalty Provision.

Tawes was both a named party and a Moose Assignee under the terms of the WIUA. Provision V of the WIUA appears to have shielded Tawes from liability to the WIUA Operator, Dominion. Consequently, if a Moose Assignee, such as Tawes, breached the WIUA, Dominion's recourse would appear to have been against Moose O&G. This may not necessarily be true for the JOA, however. The language of Provision V of the WIUA seems to make Moose O&G liable on behalf of the Moose Lessees to the Operator. The WIUA and the JOA named Dominion as the Operator, but Dominion was not the Operator of the Baker-Barnes Nos. 1 and 2 wells. Dominion went Non-Consent on the development of those two wells, and the Consenting Parties selected Moose as the Operator. As a result, Provision V of the WIUA may be less relevant, and the JOA's Royalty Provision may become the operative language. Further, the WIUA states, "the Working Interest Unit . . . will be governed by the Operating Agreement attached hereto." The JOA's Royalty Provision assigns liability as between Consenting Parties and Non-Consenting Parties, rather than as between operator and non-operators.

12

The issue seems to turn on the relationship between the WIUA and the JOA, and which is given priority. Tawes contends that greater weight must be placed on the WIUA; Barnes argues the JOA controls.[5]

## C. *Apportionment of Recovery*

The district court found Tawes liable for all royalties owed to Barnes from Baker-Barnes Nos. 1 and 2 wells that accrued as of February 2002. Tawes contends that the court erred, because he can, at most, be held responsible only for an amount proportionate to his interest in the properties at that time. Tawes asks this court to reduce the judgment by the corresponding amount. Tawes cites contract language limiting each party's responsibility to its proportionate share. He relies on, *inter alia*, Article III.B of the JOA, which states that "[u]nless changed by other provisions . . . the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of their interests." JOA Article I ("Definitions") bolsters this language, according to Tawes.[6]

The district court determined that the above-quoted JOA "Royalty Provision" modified the proportionate share language generally employed in the WIUA and JOA by expanding the liability of Consenting Parties to the payment of "all royalty." The court noted that the Consenting Parties' allocation of *costs*

---

[5] We note in passing that Tawes *additionally* and *separately* contends that because Barnes released Dominion from liability in the Settlement, she has lost whatever status she might have had under the JOA. The district court noted that that issue was not preserved for appeal to the district court under Bankruptcy Rule 8006 because Tawes did not include it in his appellate briefs nor in his statement of issues on appeal. Tawes did not raise this issue before the bankruptcy court, but raised it for the first time on motion for rehearing before the district court. As a matter of federal procedural law, we affirm the district court's ruling because Tawes waived this additional, separate settlement issue by waiting until a motion for rehearing to raise it. *See In re GGM, P.C.*, 165 F.3d 1026, 1031–32 (5th Cir. 1999).

[6] Tawes points to Article I, paragraph G, which states: "The terms 'Drilling Party' and 'Consenting Party' shall mean a party who agrees to join in and pay *its share* of the cost of any operation conducted under the provisions of this agreement." (emphasis added).

was explicitly limited to each party's proportionate share whereas what we call the Royalty Provision of the JOA contained no such limitation. While the WIUA and JOA generally allocate responsibilities proportionately, Article III.B of the JOA, which generally sets out proportionate sharing of costs and production, begins by stating "Unless changed by other provisions." The argument goes that such sophisticated parties demonstrated their ability to apportion when they wished and that they did not apportion in what we have called the JOA's "Royalty Provision" tends to suggest they did not intend apportionment there. The district court then distinguished costs from royalties:

> "[T]he relationship between non-operators and operators involving royalty payments is distinct from the relationship between non-operators and operators involving development and operation costs. First, each non-operator independently chooses whether or not he will be specifically responsible for royalty payments. As lessees, the non-operators choose to specifically obligate themselves to their lessors for royalties under their respective oil, gas and mineral leases. Therefore, the share of royalties due by each non-operator under the WIUA and JOA corresponds to his individual liability under his respective lease, except in the case of non-consent operations. In the case of non-consent operations, the parties independently choose whether or not they wish to participate, and therefore have control over whether or not to specifically incur additional royalty obligations. Second, the operators in this case have no discretion over royalty payments. Operators may not choose who to pay royalties to, what percentage royalty to pay, or when to pay royalties."

If royalties are for this purpose distinguishable from costs, then apportionment arguably may not be appropriate. Nonetheless, if the contractual interpretation under Texas law reveals the intent of the parties was to apportion, then that intent likely should be given effect.

In sum, the language in the JOA, "Consenting parties shall be responsible for the payment of . . . all royalty," is arguably consistent with two interpretations. First, it could mean that *each* Consenting Party is responsible

14

for all royalty.[7] Second, it could mean that Consenting Parties *as a group* are responsible for all royalty.

## IV. Questions Certified

We accordingly hereby certify the following three determinative questions of Texas law to the Supreme Court of Texas:

1. The Barnes leased their land to Dominion's predecessors in interest. Moose O&G and the Moose Assignees, including Tawes, leased the adjacent lands. Dominion, Moose O&G, and the Moose Assignees, including Tawes, signed the WIUA and JOA in an effort to pool the Barnes' lease with adjacent lands. Dominion did not consent under the contract to the drilling of two wells on the pooled land. Moose O&G and the Moose Assignees, including Tawes, consented to the drilling of these two wells.

*Certified Question One*: Does Barnes have any right enforce the contract – the WIUA and JOA – between Dominion, Moose O&G, and the Moose Assignees, including Tawes, to recover unpaid royalties, between the date of first production and February 2002, of Baker-Barnes Nos. 1 & 2 wells under what we have called the "Royalty Provision" of the JOA, either as a third-party beneficiary of the WIUA and JOA or by virtue of having privity of estate with Tawes?

2. The WIUA states that Moose O&G "shall be the liable party to the Operator" on behalf of the Moose assignees, including Tawes. Dominion's predecessor-in-interest was originally agreed to be the Operator of the wells drilled. Dominion exercised its rights under the contract to remain a Non-

---

[7] If the interpretation that each Consenting party is responsible for all royalty is correct, another issue, potentially relevant to the case, is the question of whether Barnes may recover from Tawes more than the amount of production attributable to Tawes. That is, if Tawes is responsible for "all royalty" of Barnes, is he personally liable for any royalty beyond the actual amount he received from production from the Baker-Barnes 1 and 2 wells or is he only liable for "all royalty" up to the amount he received from that production?

Consenting Party to the wells at issue, and Moose O&G was the operator thereof. The JOA states that "[C]onsenting Parties shall be responsible for the payment of . . . all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production."

*Certified Question Two*: If Barnes may enforce the contract, does the WIUA prevent Barnes from recovering from Tawes?

3. The JOA states, "[u]nless changed by other provisions . . . the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of their interests." As a Non-Consenting Party under the contract, Dominion, Barnes' lessee, received no production during the consenting period. The Royalty Provision states that in this situation, Consenting Parties are responsible for all production.

*Certified Question Three*: If Tawes, as a Consenting Party, is responsible for royalties under the JOA, does the JOA Royalty Provision change the agreement within the JOA such that Tawes is responsible for all of Barnes' unpaid royalty jointly and severally, or does the JOA limit Tawes' liability for unpaid royalty to the extent of his interest in the two wells at issue between the date of first production and February 2002?

We disclaim any intention or desire that the Supreme Court of Texas confine its reply to the precise form or scope of the questions certified.

16