**FIRST BANK, Petitioner,**

v.

**Richard BRUMITT, Respondent**
**No. 15-0844**

Supreme Court of Texas.

Argued February 8, 2017

Opinion delivered: May 12, 2017

David T. Moran, Andrew D. Graham, Jackson Walker L.L.P., Dallas, Adam W. Aston, Sean D. Jordan, Jackson Walker L.L.P., Austin, Deborah Colleen Simm Riherd, Donald L. Turbyfill, Devlin Naylor & Turbyfill, P.L.L.C., Houston, for Petitioner.

Richard A. Sheehy, Sheehy, Ware & Pappas, P.C., Houston, Michael A. Moriarty, Moriarty Law Firm, Houston, Avishay Moshenberg, Daniel O. Goforth, Ryan King, Goforth Easterling LLP, Houston, for Respondent.

Justice Boyd delivered the opinion of the Court.

"As a general rule, parties in Texas may contract as they wish," *Phila. Indemn. Ins. Co. v. White*, 490 S.W.3d 468, 475 (Tex. 2016), and only "the parties to an agreement determine its terms," *Royston, Rayzor, Vickery, & Williams, LLP v. Lopez*, 467 S.W.3d 494, 503–04 (Tex. 2015). In this case, a plaintiff who was not a party to a written contract claims that the contract permits him to enforce the agreement as a third-party beneficiary. We hold that the contract is unambiguous and does not make the plaintiff a third-party beneficiary. We also hold that the trial court erred by submitting that issue to the jury and by instructing the jury that it could consider extrinsic evidence to add a third-party-beneficiary term to the unambiguous written agreement. We reverse the court of appeals' judgment and remand the case to that court for further consideration of the plaintiff's other claims.

## I.

### Background

This case arises from the unsuccessful sale of a Houston-area information-technology company called Southway Systems, Inc.[1] Richard Brumitt, who owned Southway, agreed to sell his stock to another Houston-area information-technology company, DTSG, Ltd.[2] DTSG's owner and president, Don Oprea, initially wanted to purchase Brumitt's stock in two companies, Southway and NetStar Telecommunications. Seeking financing for the purchases, Oprea met with Tim Duffy,

---

1. The parties dispute many of the facts regarding their transactions and communications. Although we endeavor to briefly describe the evidence relevant to the issues before us, we expressly do not prejudge any evidentiary issues that may be relevant on remand.

2. Initially, the purchaser was DTS Group, LLP, a predecessor to DTSG, Ltd. *See infra* n.3.

president of First Bank's division that handled federal Small Business Administration (SBA) loans. Oprea selected First Bank because he and DTSG already had an ongoing banking relationship with the bank. Shortly after their first meeting in September 2007, Duffy reviewed the companies' financial records and concluded that DTSG could have difficulty qualifying for the amount needed to purchase both of Brumitt's companies. Oprea and Brumitt then agreed that DTSG would acquire Southway but not NetStar.

At their first meeting, Oprea explained to Duffy that "a sense of urgency" existed and he needed to close on the loan by year's end because Brumitt was anxious to sell Southway and already had pending offers from other interested buyers. Duffy told Oprea that they could close the loan by then because First Bank was a "preferred lender" and had "streamlined the [SBA-lending] process." Unfortunately, things did not go as planned. Over the next fourteen months, First Bank scheduled and postponed numerous closings. By November 2008, the loan still had not closed, and Oprea decided to seek financing elsewhere. Ultimately, Oprea never obtained a loan and DTSG never acquired Southway. By the time of trial in March 2013, Southway no longer had any employees and had essentially failed.

The parties dispute the reasons for the delays in the loan process. Duffy contends that he and others at First Bank worked diligently to close the loan, but numerous unexpected obstacles arose that were beyond First Bank's control. Although Duffy admits that First Bank made some mistakes in the process, he attributes the various delays to several other events that occurred along the way: Oprea allowed DTSG's registration to expire and made changes to its corporate name and structure;[3] SBA changed the rules that govern its approval process; First Bank's attorney delayed preparing the loan documents; First Bank discovered that Southway had a line of credit with Wells Fargo that had to be included in the loan amount and paid off; DTSG fell behind on payments on its own line of credit with First Bank; the parties agreed to various changes in the loan amount; and First Bank had to "take care of some internal issues."

Oprea contends that most of Duffy's reasons for the delays were merely excuses and that First Bank never gave the transaction the attention it required. Instead, according to Oprea, Duffy repeatedly made promises that the loan would close, each of which was followed by misrepresentations about why he could not keep those promises. After promising in September 2007 to close the loan by the end of the year, Duffy said in November that it might take until early January 2008. In December 2007, Duffy said the loan "is in approval," and Oprea understood it would still be completed by year's end. In early January 2008, Oprea emailed Duffy for an update and Duffy's reply encouraged Oprea to "hold tight; it's not over til it's over." In late February, Duffy said the closing would occur in early March. In

---

**3.** During the negotiations, Oprea applied to register a new entity named DTS Group, Inc. Oprea testified that he decided to transition from DTS Group, LLP to DTS Group, Inc. because other companies prefer to do business with incorporated entities. Oprea provided First Bank with the stock purchase agreement—as required by the loan commitment letters—between Southway and DTS Group, Inc. First Bank rejected the agreement because its loan-commitment letters named DTS Group, LLP as the borrower. Because DTS Group, LLP had ceased to legally exist in the interim and therefore could not be a party to the loan agreement, Oprea formed a third entity, DTSG, Ltd., to be the recipient of the loan.

April, Duffy told Oprea that First Bank could commit to closing the loan in April or May if DTSG reduced the loan amount. In late June, Duffy said they would close no later than July 15. On July 28, Duffy promised to close on August 4. On August 6, Duffy sent an email saying he had to change some things, and although it was "not [his] happiest hour, . . . [the loan] will get done." Finally, after Oprea complained to First Bank's senior vice-president, Duffy texted Oprea in September, saying "you are approved." By October, however, no closing was scheduled and Duffy was still promising that the loan would close soon. In short, Oprea claimed that Duffy "continued to make . . . promises week by week—actually on a weekly basis—that they were going to get the loan closed," but always had an excuse for why the closing could not occur.

Throughout these months, Oprea and Brumitt became increasingly agitated, but Oprea did not want to start the process over with another bank. Meanwhile, Oprea and Brumitt had informed Southway's employees of the impending ownership change and were "putting something in place" for the transition, but the continuing delays and increasing uncertainty caused employees to leave. Morale at Southway was "going downhill." In November 2008, Oprea retrieved his file from First Bank, but he returned it a few days later because Duffy promised he would find some way to get the loan done. Although Duffy took steps to determine whether another bank would provide the loan, he told others at First Bank that the loan was a "dead deal" and never scheduled another closing date.

Oprea and DTSG sued First Bank in October 2009.[4] Brumitt soon intervened as an additional plaintiff, alleging that he was a third-party-creditor beneficiary of the three "loan commitment letters executed by DTSG and First Bank."[5] At trial in 2013, the jury found First Bank liable to both DTSG and Brumitt for breach of contract and for negligent and grossly negligent misrepresentations. The trial court entered judgment based on the jury's verdict, awarding Brumitt $1,006,000 as breach-of-contract damages, $250,000 as damages for negligent misrepresentation, and $250,000 as exemplary damages for gross negligence. Including attorney's fees and pre-judgment interest, Brumitt's award totaled $1,815,460 plus court costs, post-judgment interest, and attorney's fees on appeal.

First Bank appealed. As to Brumitt's claims, the court of appeals affirmed the judgment on the breach of contract claim, expressly concluding that Brumitt was entitled to recover as a third-party beneficiary of the agreement between First Bank and DTSG. *First Bank v. DTSG, Ltd.*, 472 S.W.3d 1, 19 (Tex. App.—Houston [14th Dist.] 2015). The court reversed the judgment on the negligent and grossly negligent misrepresentation claims, however, concluding that Brumitt failed to establish any injury independent from the economic loss he sustained as a result of First Bank's contractual breach. *Id.* First Bank filed a petition for review, arguing that the court of appeals erred in holding First Bank liable to Brumitt as a third-party beneficiary.[6] Brumitt disagrees, and alternatively urges us to affirm the judgment in

---

**4.** DTSG initially named other banking entities and Duffy as defendants but later dismissed all claims against them.

**5.** Southway also intervened as an additional plaintiff but later dismissed its claims.

**6.** In this Court, First Bank does not challenge its liability to DTSG.

his favor based on negligent and grossly negligent misrepresentation. In reply, First Bank asserts that Brumitt waived his alternative argument and this Court must therefore render a final judgment in First Bank's favor on all of Brumitt's claims.

## II.

### Third-Party Beneficiary

We begin by addressing the third-party-beneficiary issues. On those issues, we conclude that (A) the agreement between First Bank and DTSG is unambiguous and did not make Brumitt a third-party beneficiary; (B) the trial court erred by submitting that issue to the jury; (C) the trial court also erred by permitting the jury to consider extrinsic evidence when addressing that issue; and (D) Brumitt cannot rely on any alleged oral agreement between First Bank and DTSG as a basis for claiming third-party-beneficiary status.

 Well-established principles govern our analysis of these issues. As a general rule, the benefits and burdens of a contract belong solely to the contracting parties, and "no person can sue upon a contract except he be a party to or in privity with it." *House v. Hous. Waterworks Co.*, 88 Tex. 233, 31 S.W. 179, 179 (1895). An exception to this general rule permits a person who is not a party to the contract to sue for damages caused by its breach if the person qualifies as a third-party beneficiary. *See, e.g., MCI Telecomms. Corp. v. Tex. Utils. Elec. Corp.*, 995 S.W.2d 647, 651 (Tex. 1999). Absent a statutory or other legal rule to the contrary,[7] a person's status as a third-party beneficiary depends solely on the contracting parties' intent. *Stine v. Stewart*, 80

S.W.3d 586, 589 (Tex. 2002). Specifically, a person seeking to establish third-party-beneficiary status must demonstrate that the contracting parties "intended to secure a benefit to that third party" and "entered into the contract directly for the third party's benefit." *Id.*; *see also S. Tex. Water Auth. v. Lomas*, 223 S.W.3d 304, 306 (Tex. 2007) (per curiam) ("A third party may only enforce a contract when the contracting parties themselves intend to secure some benefit for the third party and entered into the contract directly for the third party's benefit."). It is not enough that the third party would benefit—whether directly or indirectly—from the parties' performance, or that the parties knew that the third party would benefit. *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 421 (Tex. 2011); *Lomas*, 223 S.W.3d at 306; *MCI*, 995 S.W.2d at 651. Nor does it matter that the third party intended or expected to benefit from the contract, for only the "intention of the contracting parties in this respect is of controlling importance." *Banker v. Breaux*, 133 Tex. 183, 128 S.W.2d 23, 24 (1939). To create a third-party beneficiary, the contracting parties must have intended to grant the third party the right to be a "claimant" in the event of a breach. *Corpus Christi Bank & Tr. v. Smith*, 525 S.W.2d 501, 505 (Tex. 1975).

 To determine whether the contracting parties intended to directly benefit a third party and entered into the contract for that purpose, courts must look solely to the contract's language, construed as a whole. *Southland Royalty Co. v. Pan Am. Petroleum Corp.*, 378 S.W.2d 50, 53 (Tex. 1964); *Citizens Nat'l Bank in Abilene v. Tex. & P. Ry. Co.*, 136 Tex. 333, 150

---

**7.** *See, e.g., Dairyland Cty. Mut. Ins. v. Childress*, 650 S.W.2d 770, 775 (Tex. 1983) (holding that statutory compulsory insurance requirement "implies that all potential claim-ants for damages resulting from automobile accidents are intended as beneficiaries of the statutorily required automobile liability coverage").

S.W.2d 1003, 1006 (1941). The contract must include "a clear and unequivocal expression of the contracting parties' intent to directly benefit a third party," and any implied intent to create a third-party beneficiary is insufficient. *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011); *see also Stine*, 80 S.W.3d at 589; *MCI*, 995 S.W.2d at 651; *Citizens Nat'l Bank*, 150 S.W.2d at 1006. Courts may not presume the necessary intent. To the contrary, "we must begin with the presumption" that the parties contracted solely "for themselves," and only a clear expression of the intent to create a third-party beneficiary can overcome that presumption. *Corpus Christi*, 525 S.W.2d at 503–04. If the contract's language leaves any doubt about the parties' intent, those "doubts must be resolved against conferring third-party beneficiary status." *Tawes*, 340 S.W.3d at 425. Although a contract may expressly provide that the parties do *not* intend to create a third-party beneficiary, *see, e.g.*, *MCI*, 995 S.W.2d at 651–52, the absence of such language is not determinative. "Instead, the controlling factor is the absence of any sufficiently clear and unequivocal language demonstrating" the necessary intent. *Tawes*, 340 S.W.3d at 428.

For example, we have applied these principles to conclude that a contract created a third-party beneficiary when:

- the contract expressly stated that one of its purposes was to benefit the specific third parties and "directly guarantee[d]" that the third parties would receive those benefits, *City of Hous. v. Williams*, 353 S.W.3d 128, 145–46 (Tex. 2011) (quoting *In re Moose Oil & Gas Co.*, 613 F.3d 521, 528 (5th Cir. 2010)) (holding that city's firefighters were third-party beneficiaries of agreement between city and union); and

- the contract expressly provided that the parties intended to satisfy a specific outstanding debt to a particular third party and set forth the parties' agreement among themselves as to how they would satisfy that debt, *Stine*, 80 S.W.3d at 589–90 (holding that divorcing parties intended to make wife's mother a third-party beneficiary of their divorce agreement, which specified how the parties would repay funds she loaned towards the purchase of their home).

By contrast, we have applied these same principles to conclude that a contract did not create third-party beneficiaries when:

- the contract failed to identify any "specific, limited group of individuals" to which the consenting parties owed an obligation, *Tawes*, 340 S.W.3d at 428 (holding that oil-and-gas lessor was not a third-party beneficiary to contract between lessee and investor);

- the contract merely provided that one party, which agreed to purchase a product from the other party, intended to sell the product to the third parties, *Lomas*, 223 S.W.3d at 306–07 (holding that city's water customers were not third-party beneficiaries of contract between city and water supplier);

- the contract prohibited one party from interfering with third parties' "existing prior rights" but expressly disclaimed any intent to create third-party beneficiaries, *MCI*, 995 S.W.2d at 649–51 (holding that electric transmission company that had a preexisting right of way along railway was not a third-party beneficiary of railway's subsequent contract granting right of way to cable company); and

- a contractual promise that would benefit a third party was clearly intended

for the benefit of one of the contracting parties, *Corpus Christi*, 525 S.W.2d at 505 (holding that subcontractors were not third-party beneficiaries of contract between city and general contractor even though it conditioned city's payment obligation on general contractor's payments to subcontractors); *Citizens Nat'l Bank*, 150 S.W.2d at 1006 (holding that contract that required railway to pay contractor's suppliers before paying the contractors "was inserted therein for the benefit of the Railway alone" and not for the suppliers).

We now apply these principles to the agreement between First Bank and DTSG.

## A. The Unambiguous Loan-Commitment Letters

██ In his petition in intervention, Brumitt alleged that he is a third-party beneficiary of three "loan commitment letters executed by DTSG and First Bank." The first letter,[8] which the parties signed in February 2008, stated that First Bank would provide a ten-year SBA loan to DTSG for $1,250,000, and described the "loan purpose" as to "finance the purchase of existing business." The two-page letter described the loan rate, loan fees, repayment terms, collateral, and guarantors and listed seven "Conditions/Requirements," one of which was First Bank's "receipt and review of final purchase agreement." The second letter, which the parties signed in April 2008, reduced the loan amount to $800,000 and expressly identified Oprea as a guarantor, but was otherwise identical to the first. The third letter, signed in September 2008, increased the loan amount to $923,000 and identified different guarantors, but otherwise remained the same.

We agree with First Bank that these loan-commitment letters are unambiguous and did not clearly express the parties' intent to make Brumitt a third-party beneficiary. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) ("If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous."). None of the three letters ever mentioned Brumitt or Southway or referred in any way to the seller from whom DTSG intended to purchase the "existing business." We could perhaps presume that Brumitt, as the seller of the existing business, would benefit from the sales transaction and thus from First Bank's agreement to finance that transaction, and we could also presume that both Oprea and Duffy knew that Brumitt would benefit. But such presumptions cannot support Brumitt's claim to be a third-party beneficiary. *See, e.g., Corpus Christi*, 525 S.W.2d at 503–04 (holding that we presume the opposite, and a party seeking to overcome that presumption must do so with contractual language that "clearly" expresses that intent). Contracts often benefit third parties, and the contracting parties are often aware that their performance under the contract will benefit third parties. Whether a third party may sue to enforce the parties' agreement, however, depends not on whether the third party will benefit or on whether the parties knew that the third party would benefit, but on whether the contracting parties "intended to secure a benefit to [a] third party" and "entered into the contract directly for the third party's benefit." *Stine*, 80 S.W.3d at 589.

Here, the commitment letters' references to the loan's purpose—to finance DTSG's "purchase of [an] existing busi-

---

8. First Bank actually issued a commitment letter shortly before this one, but it contained errors and Oprea returned it for corrections without signing it.

ness"—and to the requirement of an acceptable "purchase agreement" indicate that DTSG and First Bank were aware that the seller would benefit from the loan agreement. But at most, they merely imply that the parties intended to confer some benefit to the business' seller, and any such implications are simply insufficient. *See Tawes*, 340 S.W.3d at 425. Nothing in the loan-commitment letters "clearly," "fully," and "unequivocally" expresses the parties' intent to "contract directly for [Brumitt's] benefit" and thus to confer on Brumitt the right to be a "claimant" in the event of a breach. *Stine*, 80 S.W.3d at 589; *see Corpus Christi*, 525 S.W.2d at 505.[9] Relying on the agreement's plain and unambiguous language, we conclude that Brumitt is not a third-party beneficiary.

### B. Question of Law for the Court to Decide

 Despite the lack of any ambiguity in the parties' agreement, the trial court asked the jury to determine whether "First Bank fail[ed] to comply with an agreement with Brumitt as a third-party beneficiary." First Bank contends that the court erred by asking the jury to determine whether Brumitt is a third-party beneficiary because the issue presents a legal question that the trial court should have decided. We agree. When a contract's language is unambiguous, courts must "construe the contract as a matter of law." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *see also Chrysler Ins. Co. v. Greenspoint Dodge of Hous., Inc.*, 297 S.W.3d 248, 252 (Tex. 2009); *City of Pinehurst v.*

*Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968); *Myers v. Gulf Coast Minerals Mgmt. Corp.*, 361 S.W.2d 193, 196 (Tex. 1962). And whether the contract is ambiguous is itself a question of law for the court to decide. *See Anglo–Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 449 (Tex. 2011).

The court of appeals did not expressly decide whether the loan-commitment letters are ambiguous.[10] Instead, the court concluded that the trial court properly submitted the third-party-beneficiary issue to the jury even if the letters are *unambiguous*. 472 S.W.3d at 18. Addressing our decision in *Basic Capital Management v. Dynex Commercial*, 348 S.W.3d 894, 899–901 (Tex. 2011), the court acknowledged that we "noted" in that case "that the construction of an unambiguous instrument is a question of law for the court," but observed that we "did not state that the determination of the third-party-beneficiary issue is a question of law for the court." 472 S.W.3d at 18. Apparently influenced by its mistaken conclusion that evidence outside the parties' written agreement is admissible on the third-party beneficiary issue—an issue we discuss further below—the court upheld the trial court's decision to submit the issue to the jury. *Id.* at 18–19.

As we have explained, when a contract is unambiguous, the issue of whether a non-contracting party is a third-party beneficiary depends solely on the contracting parties' intent as expressed within the par-

---

**9.** Because the commitment letters themselves do not clearly express an intent to confer a benefit on any third party or to contract directly for a third party's benefit, we need not consult the circumstances surrounding the parties' contract. *See* discussion *infra* at II.C.

**10.** The court of appeals held that the trial court "did not err in overruling First Bank's

objection that no third-party-beneficiary issue should be submitted to the jury because ... construction of the *unambiguous* Letters is a matter of law for the court." 472 S.W.3d at 28 (emphasis added). It is unclear, however, whether the court's description of the letters as "unambiguous" refers to First Bank's assertion or the court's own conclusion.

ties' agreement. *Stine*, 80 S.W.3d at 589; *Citizens Nat'l Bank*, 150 S.W.2d at 1006. The parties' intent to create a third-party beneficiary is thus simply a contract term like any other of the contract's terms. And as with all unambiguous contractual terms, the court must "construe the contract as a matter of law." *Coker*, 650 S.W.2d at 393. Here, the trial court should have decided whether the commitment letters are ambiguous and whether they clearly, fully, and unequivocally express the parties' mutual intent to make Brumitt a third-party beneficiary. We conclude that the trial court erred by submitting that issue to the jury.

## C. Extrinsic Evidence

 In addition to submitting the third-party beneficiary issue to the jury, the trial court concluded that the jury could consider evidence beyond the agreement's language. Specifically, the court provided the following instruction to the jury:

> If the intent to benefit a third party is not expressed in the contract, then intent may be shown using other evidence. The nature of the agreement, the identity of the alleged intended beneficiaries,

and the specific duty said to have been created toward them are all factors for consideration. The beneficiary may recover if he can show that he is one of a class of persons for whose benefit the contract was made.

The court of appeals upheld the trial court's submission of this instruction, holding that "extrinsic evidence may be considered in determining whether a person is a third-party beneficiary of the contract, even if the contract is a written, unambiguous contract." 472 S.W.3d at 19. First Bank contends that the court of appeals' holding is contrary to Texas law, and we agree.[11] When a written contract is unambiguous and does not clearly express the parties' intent to create a third-party beneficiary, extrinsic evidence is simply irrelevant and inadmissible on that issue. In such a case, the trial court can neither submit the issue to a jury nor rely on extrinsic evidence to add terms to the parties' unambiguous agreement. *See Citizens Nat'l Bank*, 150 S.W.2d at 1006.

When deciding whether the parties to an unambiguous contract intended to create a third-party beneficiary, we have long held that courts must look solely to the contract's language. *See Southland Royalty*

---

**11.** Brumitt argues that First Bank waived this argument by failing to object to the court's instruction. Although Brumitt acknowledges that First Bank objected to the third-party-beneficiary question on the ground that Brumitt was not a third-party beneficiary as a matter of law, he contends that there is a "big difference" between that objection and an objection to the instruction itself. The court of appeals observed that First Bank "arguably objected" to the instruction, but did not reach the issue because it concluded that the instruction was proper. 472 S.W.3d at 20 n.24. We conclude that First Bank preserved its objection to the consideration of extrinsic evidence. At the charge conference, First Bank's counsel referred the court to the third-party-beneficiary question and specifically objected because it "invites them to look at other evi-

dence." The trial court responded by explaining his thought that the agreement "doesn't have to be ambiguous, but if you have to look outside the contract, like, intent, that you submit it to the jury." First Bank's counsel replied, "No, Your Honor. The case law is very clear that you look solely to the contract and if that third-party beneficiary status is not there, you can't look outside the contract." We hold that First Bank's objection was sufficient to "point out distinctly the objectionable matter and the grounds of the objection" and thus preserved the error of which First Bank now complains. TEX. R. CIV. P. 274; *see also State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992) (holding that objecting party must make "the trial court aware of the complaint, timely and plainly, and obtain[ ] a ruling").

*Co.*, 378 S.W.2d at 55; *Citizens Nat'l Bank*, 150 S.W.2d at 1006. In this regard, the law treats the parties' agreement regarding third parties the same as it treats any of the contract's other terms. *See, e.g., Apache Deepwater, LLC v. McDaniel Partners, Ltd.*, 485 S.W.3d 900, 906 (Tex. 2016) ("When a contract's meaning is unambiguous, our task is to determine the parties' intentions as expressed in the written instrument."); *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 831 (Tex. 2009) ("Our cardinal concern is determining the parties' intent as reflected in the terms of the policy itself.").

In concluding that the trial court properly permitted the jury to consider extrinsic evidence, the court of appeals relied primarily on our decision in *Basic Capital*, in which we referred to "the undisputed evidence" regarding the contract's "negotiation and purpose" and to "the attending circumstances." *Basic Capital*, 348 S.W.3d at 901 & n.24. As further support, the court relied on our decision in *Sharyland*, in which we held that the plaintiff was not a third-party beneficiary in part because it was "neither mentioned in the contracts themselves, nor is there evidence that [the contracting parties] intended to confer a direct benefit on [the plaintiff]." 354 S.W.3d at 421. We conclude that the court's reliance on *Basic Capital* and *Sharyland* was misplaced.

*Basic Capital* involved a contract between a commercial lender, Dynex Commercial, and a real estate investment company, Basic Capital Management.[12] *See Basic Capital*, 348 S.W.3d at 896–97. Basic Capital managed and owned stock in various real estate investment trusts, including American Realty Trust and Transcontinental Realty Investors. *See id.* at 896. American and Transcontinental acquired properties for investment purposes, holding each property separately through other companies known as single-asset, bankruptcy-remote entities (SABREs).[13] *Id.* Although the contract identified Dynex and Basic Capital as the parties, it provided that (a) Dynex would loan money to three Transcontinental-owned SABREs, and (b) Basic Capital would then cause other Transcontinental- or American-owned SABREs to borrow another $160 million from Dynex over the following two years. *Id.* at 896–97. Dynex entered loan agreements with the three Transcontinental-owned SABREs and provided some of those funds as promised, but then stopped all funding under the agreement after interest rates increased and the terms became unfavorable. *Id.* Basic Capital, American, and Transcontinental each sued Dynex for breach of contract. American and Transcontinental alleged that they were third-party beneficiaries of the contract, and we agreed. *Id.*

After reciting the controlling legal principles,[14] we concluded that the contract

---

**12.** *Basic Capital* also involved another contract between Dynex and Transcontinental, but the language on which the court of appeals here relied related solely to the agreement between Basic Capital and Dynex. *See Basic Capital*, 348 S.W.3d at 901.

**13.** A SABRE is a distinct legal entity "that owns a single asset and whose solvency is independent of affiliates. Lenders ... commonly require a SABRE as a borrower so that in the event of default, the collateral can be recovered more easily than from a debtor

with multiple assets and multiple creditors." *Id.* at 896 (citing *In re Gen. Growth Props., Inc.*, 409 B.R. 43, 49 n.15 (Bankr. S.D.N.Y. 2009)).

**14.** *Basic Capital*, 348 S.W.3d at 897–99 (explaining that a "third party may recover on a contract made between other parties only if the parties intended to secure some benefit to that third party, and only if the contracting parties entered into the contract directly for the third party's benefit.... [T]he intention of the contracting parties is controlling. A court

clearly expressed the parties' intent to make American and Transcontinental third-party beneficiaries because it required Dynex to lend money to American- and Transcontinental-owned SABREs that did not exist when the contracts were signed. *Id.* at 900–01. We explained that the contract "expressly required" that Dynex lend to American- and Transcontinental-owned SABREs and did so as a "mechanism for [American] and [Transcontinental] to hold investment property directly but in a way that would provide Dynex greater security." *Id.* While we agreed that, "as a general proposition, a corporate parent is not a third-party beneficiary of its subsidiary's contract merely by virtue of their relationship," we concluded that this contract " 'clearly and fully spelled out' the benefit to [American] and [Transcontinental] because their role was basic to Dynex's and Basic's agreement." *Id.* at 900.[15] Indeed, we explained, if Dynex and Basic Capital "did not intend the [contract] to benefit [American] and [Transcontinental] directly, then [it] had no purpose whatever." Finally, we reaffirmed that "the proper construction of an unambiguous contract is a matter of law," and concluded that the contract "itself, and the *undisputed evidence regarding its negotiation and purpose*, establish that [American] and [Transcontinental] were third-party beneficiaries." *Id.* at 901 (emphasis added). We then cited *Banker* for the proposition that "the contracting parties' intention, which is of controlling importance, must be ascertained from their agreement *'in the light of the attending circumstances.'* " *Id.* at 901 n.24 (emphasis added) (quoting *Banker*, 128 S.W.2d at 24).

Here, the court of appeals asserted that in *Basic Capital*, instead of limiting our analysis "to the four corners of the unambiguous contract," we "considered evidence regarding the negotiation and purpose of the contract." 472 S.W.3d at 18. Based on this, the court concluded that, "after the *Basic Capital* decision, extrinsic evidence may be considered in determining whether a person is a third-party beneficiary of the contract, even if the contract is a written, unambiguous contract." *Id.* at 19. The court then found further support by noting that, six months after deciding *Basic Capital*, we stated in *Sharyland* that the plaintiff was not a third-party beneficiary because it was neither "mentioned in the contracts themselves, *nor is there evidence* that [the contracting parties] intended to confer a direct benefit on Sharyland." *Id.* (quoting *Sharyland*, 354 S.W.3d at 421).

We conclude that the court of appeals erred in its reading of *Basic Capital* and *Sharyland*. In *Basic Capital*, we held that the contract, read as a whole in light of

---

will not create a third party beneficiary contract by implication. The intention . . . must be clearly and fully spelled out or enforcement by the third party must be denied. Consequently, a presumption exists that parties contracted for themselves unless it clearly appears that they intended a third party to benefit from the contract . . . [, and] when a contract is not ambiguous, the construction of the written instrument is a question of law for the court.") (quoting *MCI*, 995 S.W.2d at 650–51).

**15.** *See* J. Richard White & G. Roland Love, *Real Property*, 66 SMU L. Rev. 1081, 1091

(2013) ("The supreme court distinguished the subject entity structure from that of a corporate parent; even though a corporate parent is generally not a third-party beneficiary of its subsidiaries, the explicit nature of the subject transaction and structure was to ensure the benefit of [American] and [Transcontinental] as owners of such single asset bankruptcy remote entities. The role of [American] and [Transcontinental] was vital to, and clearly delineated in, the transaction between Dynex and Basic as evidenced by the [contract].") (internal citations omitted).

the evidence of the "attending circumstances," " 'clearly and fully spelled out' the benefit to [American] and [Transcontinental] because their role was basic to Dynex's and Basic's agreement." 348 S.W.3d at 901 & n.24. Though the contract did not "expressly" identify American and Transcontinental as the intended third-party beneficiaries, the contract was otherwise sufficiently clear in its intent to create third-party beneficiaries. *See id.* at 900–01 ("Dynex and Basic could have prevented any doubt about their intentions by expressly stating in the Commitment that it was to benefit [American] and [Transcontinental]. Perhaps they did not do so because it seemed to go without saying."). *Basic Capital* is an example of a contract in which the parties clearly intended to confer benefits on third-parties and entered into the contract for that purpose, but the identity of those third-parties could only be determined by considering the surrounding circumstances. And in *Sharyland*, we held the opposite: while the plaintiff "may incidentally benefit" from the contract, "the contract falls far short of 'clearly and fully spell[ing] out' such an intent." 354 S.W.3d at 421.

Contrary to the court of appeals' conclusion, our decisions in *Basic Capital* and *Sharyland* did not change the law or announce a new rule. 472 S.W.3d at 18. In fact, as we expressly noted in *Basic Capital*, we held as early as 1939 that—to determine whether contracting parties intended to create a third-party beneficiary—it may be "necessary" to "examine" the contract's "provision, in the light of the attending circumstances, to ascertain the intention of the parties." *Basic Capital*, 348 S.W.3d at 901 (citing *Banker*, 128 S.W.2d at 24). This is merely another example of how the law treats the third-party-beneficiary issue the same as any other contractual term. We have noted for decades that the construction of an unam-

biguous contract, including the determination of whether it is unambiguous, depends on the language of the contract itself, construed in light of the surrounding circumstances. *See Anglo–Dutch Petroleum*, 352 S.W.3d at 449–50 ("Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered.") (internal quotation marks omitted) (quoting *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 451 (Tex. 2008) (per curiam)); *Tawes*, 340 S.W.3d at 426 (determining third-party-beneficiary status by considering "the oil and gas industry's customary purpose for using [joint operating agreements], and . . . the plain language of the [agreement] at issue here"); *Luling Oil & Gas Co. v. Humble Oil & Ref. Co.*, 144 Tex. 475, 191 S.W.2d 716, 724 (1946) (holding that oil-and-gas contract "must be construed in connection with the rules and the customs of the industry to which the contract relates").

These types of references to the "circumstances" surrounding a contract recognize that evidence of the circumstances may assist courts in construing the language the parties used, but they do not authorize courts to rely on such evidence to add to or alter the terms contained within the agreement itself. When parties "have a valid, integrated written agreement," the parol-evidence rule "precludes enforcement of prior or contemporaneous agreements." *Hous. Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011). As a result, "extrinsic evidence cannot alter the meaning of an unambiguous contract." *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 170 (Tex. 2009). Courts may consider the "context in which an agreement is made" when determining whether the contract is ambiguous,

but the parties may not rely on extrinsic evidence "to create an ambiguity or to give the contract a meaning different from that which its language imports." *Anglo–Dutch Petroleum*, 352 S.W.3d at 451 (internal quotation marks omitted) (quoting *David J. Sacks*, 266 S.W.3d at 450–51). *But see Lewis v. E. Tex. Fin. Co.*, 136 Tex. 149, 146 S.W.2d 977, 980 (1941) (holding that courts may not consider "proof of circumstances" evidence "when the instrument involved, by its terms, plainly and clearly discloses the intention of the parties, or is so worded that it is not fairly susceptible of more than one legal meaning or construction") (citing *Anderson & Kerr Drilling Co. v. Bruhlmeyer*, 134 Tex. 574, 136 S.W.2d 800, 805 (1940)).

 If a court concludes that the parties' contract is unambiguous, it may still consider the surrounding "facts and circumstances," but "simply [as] an aid in the construction of the contract's language." *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981). In other words, the parol-evidence rule "does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text." *Hous. Expl.*, 352 S.W.3d at 469. Courts may consider such contextual evidence "in determining the parties' intent *as expressed in the agreement*, but the court must determine the parties' expressed intent. Extrinsic evidence cannot be used to show that the parties probably meant, or could have meant, something other than what their agreement stated." *Anglo–Dutch Petroleum*, 352 S.W.3d at 451.

 It is only in this sense that we referred to "evidence" of "attending circumstances" in *Basic Capital*. We did not look to such surrounding circumstances to add to, alter, or contradict the terms to which the parties had agreed, but to inform our understanding of the unambigu-

ous terms actually contained within the contract itself. In the same way that dictionary definitions, other statutes, and court decisions may inform the common, ordinary meaning of a statute's unambiguous language, *see Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 35 (Tex. 2017), circumstances surrounding the formation of a contract may inform the meaning of a contract's unambiguous language. But courts may not rely on evidence of surrounding circumstances to make the language say what it unambiguously does not say.

Here, the trial court permitted the jury to consider extrinsic evidence as a basis for adding a term to the parties' contract, instructing the jury that the parties' intent to make Brumitt a third-party beneficiary could be established "using other evidence" if "the intent to benefit a third party is not expressed in the contract" itself. We hold that the court erred in doing so. Because the contract's language is unambiguous, the court—not a jury— should have determined the parties' intent as a matter of law, and it could not do so by relying on extrinsic evidence to create an intent that the contract itself does not express.

## D. No oral contract

 With regard to his contract claim, Brumitt finally argues that the trial court did not err because the evidence established and the jury could have found that First Bank and DTSG entered into an *oral* agreement through which they intended to make Brumitt a third-party beneficiary. Specifically, Brumitt points to evidence that, after First Bank discovered Southway had a line-of-credit debt to Wells Fargo, First Bank insisted DTSG pay off that debt and the parties increased the loan amount from $800,000 to $923,000 for that

purpose. And because Brumitt had personally guaranteed that Southway debt, First Bank and DTSG specifically intended to make Brumitt a beneficiary not only because he would receive the purchase money but also because he would be relieved of that guarantee.

We find at least four fatal obstacles to this argument.[16] First, as we have noted, Brumitt did not plead any claim based on an alleged oral agreement, and instead pleaded only that he was a third-party beneficiary of the three "loan commitment letters executed by DTSG and First Bank." Second, the trial court's charge expressly defined the parties' agreements as "the loan commitment issued by First Bank in February 2008, the loan commitment issued by First Bank in April 2008, and the loan commitment issued by First Bank in August 2008." Although Brumitt notes that this definition refers to the three "loan commitments," as opposed to the three "loan commitment letters," we conclude in light of Brumitt's pleadings and the definition's reference to the three specific commitments by date that the court could only have meant and the jury could only have understood that the agreements at issue were the letters themselves. As a result, Brumitt failed to obtain a jury finding that DTSG and First Bank entered into an oral agreement.

■■■ Third, if the parties agreed that DTSG would pay off Southway's debt and relieve Brumitt of his personal guarantee, they could only have done so at some point prior to the parties' execution of the third commitment letter, which Brumitt contends increased the loan amount to enable DTSG to pay off the Wells Fargo debt.

Although the parol-evidence rule "does not apply to agreements made *subsequent* to the written agreement," *Lakeway Co. v. Leon Howard, Inc.*, 585 S.W.2d 660, 662 (Tex. 1979) (emphasis added), the alleged oral agreement on which Brumitt relies necessarily occurred *prior* to the parties' agreement as finally expressed in the third commitment letter. Permitting Brumitt to rely on an alleged prior oral agreement to add to the terms of the parties' subsequent written agreement would violate the well-established rule that the parties' intention to create a third-party beneficiary must be "clearly and fully spelled out" in the agreement itself. *MCI*, 995 S.W.2d at 651.

Fourth, and finally, we conclude that even the evidence regarding the alleged oral agreement does not "clearly and fully" establish an intent to make Brumitt a third-party beneficiary. *See id.* At most, the evidence might establish that the parties intended to benefit Southway by paying its debt to Wells Fargo, but any intent to benefit Brumitt by relieving him of his personal guarantee would make him at most an incidental beneficiary. We thus reject Brumitt's argument that he is a third-party beneficiary based on an alleged oral agreement.

In summary, we conclude that the agreement between First Bank and DTSG does not clearly and fully express the parties' intent to make Brumitt a third-party beneficiary, and the trial court erred by submitting that issue to the jury and by permitting the jury to consider extrinsic evidence to add to the parties' agreement. We thus reverse the court of appeals' judgment upholding First Bank's liability to Brumitt for breach of contract.

---

**16.** The statute of frauds would present a fifth obstacle, but First Bank cannot rely on the statute because it failed to give the notice the statute requires. *See* Tex. Bus. & Com. Code § 26.02 (providing that loan agreements are subject to the statute of frauds). The court of appeals held that First Bank could not rely on the statute of frauds for this reason, 472 S.W.3d at 24, and First Bank does not contest that holding here.

## III.

### Negligent Misrepresentation

As an alternative argument, Brumitt urges us to affirm the part of the trial court's judgment that awarded him damages based on negligent and grossly negligent misrepresentation, or at least remand the case for the court of appeals to address First Bank's challenge to the legal sufficiency of the evidence in support of those claims. The court of appeals affirmed the part of the trial court's judgment awarding Brumitt damages for breach of contract, but reversed the part awarding damages for negligent misrepresentation, holding that Brumitt could not recover for misrepresentation because he did not prove "an injury independent from economic losses recoverable under a breach-of-contract claim." 472 S.W.3d at 27. Brumitt argues that, if we hold (as we do hold) that those losses are not in fact "recoverable under a breach-of-contract claim," the court of appeals' reason for denying recovery for misrepresentation no longer applies, and First Bank's challenge to the sufficiency of the evidence supporting that recovery must still be decided.

First Bank contends that we must render judgment in its favor on Brumitt's misrepresentation claims because Brumitt failed to file a cross-petition seeking our review of the court of appeals' judgment. Because the court of appeals' judgment holds in First Bank's favor on the misrepresentation claims, First Bank contends that Brumitt is now seeking to "alter the court's judgment" and was thus required to file a petition for review. *See* Tex. R. App. P. 53.1. Brumitt disagrees, arguing that Rule 53.1 requires parties to file a petition for review only when they are seeking greater relief than the court of appeals granted. We agree that a "party who seeks to alter the court of appeals' judgment must file a petition for review."

Tex. R. App. P. 53.1. We also agree that Brumitt is seeking to alter the court's judgment, asking us to reverse the part of the court of appeals' judgment that reversed the trial court's judgment in Brumitt's favor on the misrepresentation claims.

Rule 53.4, however, provides that a party in a case before this Court may "obtain a remand to the court of appeals for consideration of issues or points briefed in that court but not decided by that court," or "request that [this] Court consider such issues or points," if the party raises "those issues or points in the petition, the response, the reply, any brief, or a motion for rehearing." Tex. R. App. P. 53.4. Here, Brumitt requests in his brief that we consider the issue of whether the evidence supports his recovery for misrepresentation or at least remand that issue to the court of appeals. The parties briefed that issue in the court of appeals, but that court did not decide the issue. Rule 53.4 thus applies and permits Brumitt, even though he did not file a cross-petition for review, to request that we remand the issue or consider it ourselves because he properly raised it in his response brief.

Because First Bank has not addressed the sufficiency-of-the-evidence issue in its briefing to this Court, we believe it is better to remand for the court of appeals to consider and address the issue in the first instance.

## IV.

### Conclusion

The agreement between First Bank and DTSG is unambiguous and did not clearly, wholly, and unequivocally express the parties' mutual intent to make Brumitt a third-party beneficiary. The trial court erred by submitting that issue to the jury and by instructing the jury to consider extrinsic evidence. We reverse the court of

appeals' judgment, render judgment for First Bank on Brumitt's breach-of-contract claim, and remand the case to the court of appeals for further consideration of Brumitt's claims alleging negligent and grossly negligent misrepresentations.