

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00206-CV

_____

MICHAEL BERNHARDT, Appellant

V.

MARCIA GAIL BERNHARDT, Appellee

On Appeal from County Court at Law No. 2
Wichita County, Texas
Trial Court No. CCL-691-13-F

Before Sudderth, C.J.; Bassel and Wallach, JJ.
Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

The trial court signed a post-divorce enforcement judgment in favor of Appellee Marcia Gail Bernhardt and against Appellant Michael Bernhardt. In two issues, Michael contends that the evidence is legally and factually insufficient to support the trial court's judgment and that the trial court's refusal to provide him offsets constitutes an impermissible modification of the divorce decree. Michael's argument is based on a provision in the parties' agreement incident to divorce. That agreement allowed Michael an offset on his payment obligations to Marcia if certain assets were foreclosed upon by the lenders who held liens on those assets, and that provision was incorporated by reference into the divorce decree. Because we hold that the evidence did not establish Michael's entitlement to an offset and that the trial court's enforcement order does not modify the divorce decree, we affirm.

## Background

On September 29, 2016, the trial court signed an agreed final decree of divorce dissolving Michael's and Marcia's marriage. The decree awarded Marcia a judgment of $1,685,294 and required Michael to pay Marcia $5,000 a month to satisfy that judgment. The decree further incorporated by reference the terms of an agreement incident to divorce (the AID). *See* Tex. Fam. Code Ann. § 7.006.

In the AID, the parties agreed that Michael would receive the property listed on an attached exhibit, including certain properties that had been pledged as security for notes relating to ArrowMP, a business he co-owned. The AID further granted

2

Michael an offset against what he owed Marcia if the properties that had been pledged as collateral were foreclosed upon:

> The parties agree that if any of the following properties are *foreclosed upon by the lien holder*, or any successor or assign, of any outstanding loan(s) existing as of the date of this Agreement, and the property or proceeds are used towards the satisfaction of the balance of the outstanding loan(s) for which these properties are pledged as security, Michael Bernhardt shall be entitled to a corresponding credit towards the outstanding amount due on the $1,685,294.00 judgment as set forth in the parties' Agreed Final Decree of Divorce in the amount the balance of any outstanding loan(s) existing as of the date of this Agreement for which these following properties are pledged as security is reduced. [Emphasis added.]

The AID listed those properties that were subject to an offset upon foreclosure, including Michael's interests in four business entities and multiple vehicles that had been pledged as collateral to secure notes related to ArrowMP.

ArrowMP was sold in 2019. Beginning in September 2019, Michael stopped making the entire monthly payment due to Marcia, and starting in April 2020, he stopped paying her entirely. Michael's reasoning for not making payments after April 2020 was that he had sold the assets listed in the AID and used the proceeds to pay down the debt he owed to the lienholders. That is, he decided that because he had sold the listed property for purposes of paying the debt secured by the property, he no longer had to pay Marcia anything under the agreement. In March 2020, Marcia had emailed Michael to tell him that she would give him credit for the cars that were "listed, sold, and money paid to the bank" once he gave her notarized documents showing that information, but Michael never provided her with any documentation.

In 2021, Marcia filed a "Motion for Enforcement of Property Division" asserting that Michael had not made required payments under the AID and decree. *See id.* § 9.001 (authorizing proceeding to enforce divorce decree, including any contractual provisions under the terms of an agreement incident to divorce). At the evidentiary hearing, Marcia agreed that in executing the AID, her intention was "to give [Michael] a credit if the worst case happened to [ArrowMP] or those [listed] assets." She did not deny that Michael no longer had some of the listed assets, and she stated that when she had previously requested documentation from Michael about which properties had been sold, it was because she "wanted proof to know how much to give him credit for."

Michael testified that he no longer had any property that would be sufficient to pay what he owed Marcia, that he had sold most of the assets on the list, that he had consequently determined that he no longer owed any money under the divorce decree, that he had never provided Marcia with any documentary evidence that he had sold the assets, and that the AID did not require him to provide documentation. He described his selling of the assets as an "informal foreclosure" because he understood from the bank that he "had to . . . start selling these things and start paying against the debt or the bank was going to start taking actions against me with the courts." He stated that if the bank had "forced the sale, then we'd go to auction and get pennies on the dollars which would be—would hurt us tremendously, as far as getting these

notes paid back." Michael did not produce any documentation at trial to substantiate the amounts for which he claimed to have sold the vehicles.

The trial court signed an enforcement order denying Michael an offset and granting Marcia a judgment against Michael for $690,002.83. In the order, the trial court found that none of the properties listed in the AID had been foreclosed upon by the lienholder of any loan existing at the time of the AID and that Michael had never provided Marcia or the court with any documentation reflecting that any financial institution had given him credit towards the loans secured by the motor vehicles.

Michael filed a request for findings of fact and conclusions of law, but none were filed. Michael did not file a notice of past-due findings and conclusions.

**Standard of Review**

**A. Reviewing Trial Court's Findings and Conclusions**

In a bench trial in which no findings of fact or conclusions of law are filed, the trial court's judgment implies all findings of fact necessary to support it. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017). When, as here, a reporter's record is filed, these implied findings are not conclusive, and an appellant may contest them by challenging the legal and factual sufficiency of the evidence to support the judgment. *Id.* We apply the same standard when reviewing the sufficiency of the evidence to support implied findings that we use to review the evidentiary sufficiency of jury findings or a trial court's express findings of fact. *Id.* We must affirm the

5

judgment if we can uphold it on any legal theory supported by the record. *Rosemond v. Al-Lahiq*, 331 S.W.3d 764, 766–67 (Tex. 2011).

## B. Legal and Factual Sufficiency

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). In determining whether legally sufficient evidence supports the challenged finding, we must consider evidence favorable to the finding if a reasonable factfinder could, and we must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn*, 554 S.W.3d at 658 (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*,

715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

## C. Reviewing Trial Court's Construction of Contract

The construction of an unambiguous contract is a question of law for the court, which we review de novo. *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011). "Our primary concern when we construe a written contract is to ascertain the parties' true intent as expressed in the contract," and "[w]e may look to the entire agreement in an effort to give each part meaning." *Epps v. Fowler*, 351 S.W.3d 862, 865–66 (Tex. 2011).

A contract is not ambiguous "merely because the parties advance conflicting contract interpretations." *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 465 (Tex. 1998). "Parties to a contract are masters of their own choices and are entitled to select what terms and provisions to include in or omit from a contract," and "[w]e cannot change the contract simply because we or one of the parties comes to dislike its provisions or thinks that something else is needed in it." *Consol. Petroleum, Partners, I, LLC v. Tindle*, 168 S.W.3d 894, 899 (Tex. App.—Tyler 2005, no pet.) (citations omitted).

## Discussion

## I. Whether Sufficient Evidence Supports Enforcement Judgment

Michael argues in his first issue that the evidence at trial was legally and factually insufficient to support the trial court's enforcement order because the court

failed to consider the evidence of his offsets under the AID. He contends that the parties never intended that a legal foreclosure proceeding was required before he would be entitled to an offset and that both parties testified that their intent was to give Michael credit if the listed vehicles were returned to the bank or if the proceeds of the assets' sale were used to pay the loans against the property. Marcia responds that the evidence shows that Michael failed to make required payments and that he failed to produce any documentary evidence showing the sale of the assets or that the sale proceeds were applied to the balance of any loan for which the assets were pledged as collateral.

As both parties acknowledge, the AID does not spell out a process by which Michael's right to an offset should be determined and does not define the term "foreclosed." We therefore presume that the parties intended the plain, generally accepted meaning of the word. *Epps*, 351 S.W.3d at 865–66. To determine the word's common meaning, "we look to a wide variety of sources, including dictionary definitions, treatises and commentaries," and the word's prior constructions in other contexts. *Jaster v. Comet II Const., Inc.*, 438 S.W.3d 556, 563 (Tex. 2014); *see also Epps*, 351 S.W.3d at 865–66 (noting that we often consult dictionaries "to discern the natural meaning of a common-usage term not defined by contract"); *Wells Fargo Fin. Tex., Inc. v. Valero*, No. 07-12-00218-CV, 2013 WL 4531700, at *2 (Tex. App.—Amarillo Aug. 21, 2013, pet. denied) (mem. op.) (considering both the common usage

of the term foreclosure, as found in Webster's Dictionary, and its legal usage, as defined in Black's Law Dictionary).

In legal usage, "foreclosure" refers to "a proceeding in court, or out of court, when provided for by a valid contract, to subject the property (or part thereof) covered by a lien to the payment of the debt secured by the lien" that "has the effect of extinguishing all right, title or interest, if any, of the defendants in the property." *Sw. Peanut Growers Ass'n v. Womack*, 179 S.W.2d 371, 373 (Tex. App.—Eastland 1944, no writ); *see also Stewart v. Rockdale State Bank*, 52 S.W.2d 915, 916 (Tex. App.—Austin 1932) (stating that as to mortgages, the term foreclosure "implies the cutting off of the right of redemption," and "as applied to liens, it relates to the sale and not to the judgment decreeing foreclosure"), *aff'd*, 79 S.W.2d 116 (1935). In accordance with this usage, Black's Law Dictionary defines foreclosure as "[a] legal proceeding to terminate a mortgagor's interest in property, instituted by the lender (the mortgagee) either to gain title or to force a sale in order to satisfy the unpaid debt secured by the property." Foreclosure, Black's Law Dictionary (11th ed. 2019). "Power-of-sale foreclosure" or "nonjudicial foreclosure" is similarly defined as "[a] foreclosure process by which[ ] . . . the mortgaged property is sold at a nonjudicial public sale by a public official, the mortgagee, or a trustee, without the stringent notice requirements, procedural burdens, or delays of a judicial foreclosure." Power-of-Sale Foreclosure, Black's Law Dictionary (11th ed. 2019).

Merriam-Webster defines foreclosure as "a legal proceeding that bars or extinguishes a mortgagor's right of redeeming a mortgaged estate" and "the extinguishment (as under the provisions of Article 9 of the Uniform Commercial Code) of the rights of a debtor in personal property subject to a security interest by judicial proceedings and especially by judicial sale." Foreclosure, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/foreclosure (last visited Mar. 20, 2023). The Cambridge Dictionary defines "foreclose" as "the action of taking back property that was bought with borrowed money because the money was not being paid back as formally agreed." Foreclose, Cambridge Dictionary Online, https://dictionary.cambridge.org/dictionary/english/foreclosure (last visited Mar. 20, 2023).

Under none of these definitions would Michael's selling his encumbered property himself and using the proceeds to pay down his debt qualify as a foreclosure by the lien holder. Under legal and common usage, foreclosure relates to a process taken by the lienholder to recover the property securing the lien. The AID's wording reflects that meaning by its use of the phrase "foreclosed *by the lienholder*," and Michael offers no argument that persuades us to ignore the commonly understood meaning of foreclosure or the AID's "by the lienholder" language. Michael may have felt pressure from the bank to sell the vehicles to obtain funds to pay his debt, and he preferred to sell the vehicles himself to maximize the sales price, but none of the sales were a

10

foreclosure by the lienholder. Accordingly, under the AID's plain terms, his selling the property did not qualify him for an offset.

Michael argues that the context of the AID reflects that a legal proceeding by a lienholder was never the parties' intention because "[t]here was no real property involved," only personal property, "so a legal foreclosure process was never an available option." However, Michael cites no authority to support this assertion, *see* Tex. R. App. P. 38.1(i), and the word foreclosure is sometimes used to describe a lienholder's remedy with respect to personal property. *See, e.g.*, Tex. Bus. & Com. Code Ann. § 9.601 (discussing secured party's remedies under Uniform Commercial Code article governing security interests in personal property and fixtures, and listing foreclosure among the remedies); *Excela Energy, LLC v. Exalt Real Est. Grp., LLC*, No. 14-16-00388-CV, 2017 WL 2292586, at *1 (Tex. App.—Houston [14th Dist.] May 25, 2017, pet. denied) (mem. op.) (discussing landlord's foreclosure of landlord's lien on tenant's personal property); *Walsh v. Alief ISD*, No. 14-04-00076-CV, 2004 WL 2381556, at *1 (Tex. App.—Houston [14th Dist.] Oct. 26, 2004, no pet.) (mem. op.) (discussing proceeding by school district to foreclose tax liens on business personal property); *Smith v. Maximum Racing, Inc.*, 136 S.W.3d 337, 339 (Tex. App.—Austin 2004, no pet.) (discussing proceeding to foreclose mechanic's lien on vehicles). We reject his argument that the parties could not have intended to refer to an action by the lienholder when they used the word foreclosed and the phrase "by the lienholder."

11

The AID is unambiguous, and although we may consider extrinsic evidence that "illuminates contract language," we may not consider extrinsic evidence "that adds to, alters, or contradicts the contract's text." *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 767 (Tex. 2018). "'[C]ircumstances surrounding the formation of a contract may inform the meaning of a contract's unambiguous language. But courts may not rely on evidence of surrounding circumstances to make the language say what it unambiguously does not say.'" *Id.* (quoting *First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017)). Accordingly, we do not consider evidence of the parties' intent to construe the AID's plain language.[1] We overrule Michael's first issue.

## II. Whether Refusal to Grant Offsets Was an Impermissible Modification

In his second issue, Michael argues that the trial court's refusal to provide offsets to him under the AID "due to judicial requirements outside the Agreement constitutes an impermissible modification of the Final Decree of Divorce in violation of the express provision of Texas Family Code § 9.007(a)." More specifically, he asserts that the AID had no requirement for him to provide documentation of the "cars that were listed, sold, and money paid to the bank," and therefore the trial

---

[1]Even if we were to derive the parties' intent from their testimony rather than the AID's unambiguous language, we disagree with Michael's assessment of that testimony. Although Marcia testified about her willingness to give Michael a credit if he had provided her with documentation of the sales, she did not testify that the parties' intent was that Michael could sell the property, use the proceeds to pay debt, and then unilaterally declare his right to and the amount of an offset. More importantly, the AID's language does not support that interpretation.

12

court's finding that he was not entitled to an offset because he did not provide documentation to Marcia was an impermissible modification of the AID. However, the trial court did not modify the AID, and Michael's argument conflates the questions of whether he was entitled to the contractual offset and whether he satisfied the separate offer from Marcia to give him credit for the sales despite his failure to satisfy the AID's offset requirements.

The findings in the trial court's order stated the following regarding Michael's right to credit toward what he owed Marcia:

> The Court finds that none of the properties listed in article 3 of the AID were foreclosed upon by the lien holder, or any successor or assign, of any outstanding loan(s) existing as of September 27, 2016, and that in an effort to pay loans owed to his creditor(s), MICHAEL BERNHARDT voluntarily sold the following properties:
>
> [list omitted]
>
> The Court finds that MARCIA BERNHARDT offered to give MICHAEL BERNHARDT credit for the "cars that were listed, sold, and money paid to the bank" after she received proper documentation proving that had occurred. However, MICHAEL BERNHARDT never provided MARCIA BERNHARDT with documentation reflecting that . . . any financial institution had given him credit towards the loans secured by those motor vehicles nor did he produce such documentation in court.
>
> The Court finds that the parties never entered into an enforceable agreement that the proceeds of the sale of the properties listed above would entitle MICHAEL BERNHARDT to a credit towards the original $1,685,294.00 judgment.
>
> IT IS THEREFORE ORDERED that MICHAEL BERNHARDT's request for a credit towards the outstanding amount due on the original $1,685,294.00 judgment is DENIED.

The findings that no lienholder had sold the property and that Michael had sold the property voluntarily related to Michael's entitlement to an offset under the AID's terms. The finding regarding the lack of documentation, on the other hand, related to Marcia's offer in 2020 to give Michael credit for the property that he had sold—an offer she made despite Michael's not qualifying for an offset under the AID's terms.

The trial evidence supported a finding that Marcia had offered to give him credit for the sales and that he had failed to satisfy her offer. At trial, Marcia stated that she had intended "to give [Michael] the opportunity to work through whatever financial situation his company" was experiencing. Her March 2020 email to Michael stated that she was aware of his situation and was willing to work with him, "but that goes both ways." She told him,

> You need to work with me and find a way to pay something.
>
> I will give you credit on cars that were listed, sold, and money paid to the bank *once I have notarized documents proving that*. You were supposed to have done that at the time of each transaction. According to the decree, those amounts come off the back end of our agreement.
>
> Please be aware that you have created an equally difficult situation for me. . . . You must find a way to meet your obligations. [Emphasis added.]

Michael acknowledged that he never provided her with any documents regarding the sales.

Accordingly, the trial court had evidence from which it could and did find that Marcia offered to give Michael credit for the vehicle sales if he provided her with

14

documentation and that Michael never provided that documentation. The AID required foreclosure by the lienholder, but Marcia's offer did not. The trial court's finding regarding Michael's failure to satisfy Marcia's offer did not modify the AID or the divorce decree. We overrule Michael's second issue.

## Conclusion

Having overruled Michael's two issues, we affirm the trial court's order.


/s/ Mike Wallach
Mike Wallach
Justice

Delivered:  March 23, 2023