# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00513-CV

**Patrick Towne and Veritas Financial Series E3d LLC, Appellants**

**v.**

**Devin Black, Andrei Duta, and 823 Hwy 71 W LLC, Appellees**

### FROM THE 423RD DISTRICT COURT OF BASTROP COUNTY
### NO. 423-6737, THE HONORABLE CHRISTOPHER DARROW DUGGAN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This appeal arose from a failed real estate development partnership between appellant Patrick Towne and appellees Devin Black and Andrei Duta. Towne, Black, and Duta formed 823 HWY 71 W LLC (the "Company") in furtherance of purchasing undeveloped land. After the Company closed on its purchase of that real estate, the parties' relationship soured, with the parties disagreeing whether Towne had a membership interest in the Company. Towne and Veritas Financial Services E3d LLC (E3D) filed suit, contending Towne was an initial member under the Company's operating agreement, but Black and Duta responded that Towne was never a member because he failed to make a required capital contribution. The trial court agreed with Black and Duta, concluding that Towne was not, and had never been, a member of the Company; denying Towne's motion for partial summary judgment; granting appellees' motions for partial summary judgment; and entering a final judgment order that Towne and E3D take nothing on their claims.

Towne and E3D now appeal, arguing that the trial court erred in reaching those conclusions, that the court's decisions on the summary judgment motions are predicated on those erroneous conclusions, and that final judgment could not have been entered because there were still unadjudicated claims. For the following reasons, we affirm the trial court's final judgment.

## BACKGROUND

On September 27, 2017, Lost Pines Ventures Series LLC ("Lost Pines")[1] executed a contract for the purchase of undeveloped acreage near Highway 71 West in Bastrop, Texas (the "Property"). Towne and Duta signed the purchase contract as the managing members of Lost Pines. The Company was then formed on February 12, 2018, and Towne and Duta, on behalf of Lost Pines, executed an assignment of the purchase contract from Lost Pines to the Company on February 19, 2019.

On March 1, 2018, Duta, Towne, and Black signed the original operating agreement for the Company (the "Agreement"). Relevant to this appeal, the Agreement included the following provision regarding the initial capital contributions of the Members:

**Section 3.1 <u>Initial Capital Contributions of the Members</u>**

(a) Each Member shall contribute cash, other property, or services to the Company in the amount set forth as the Initial Capital Contribution of such Member on <u>Schedule 1</u> attached hereto and hereby made a part hereof. Such cash or other property shall be the Initial Capital Contribution of each such Member and each such Member agrees to make its Initial Capital Contribution.

(b) Upon making the Initial Capital Contribution each Member shall receive its Membership Interest and its initial Sharing Ratio as set forth in <u>Schedule 1</u>.

---

[1] Towne and E3D aver in their pleadings that E3D was doing business as Lost Pines.

The entirety of Schedule 1 to the Agreement is as follows:

**Schedule 1**
**Investor Schedule[]**

**Names, Addresses, Initial Capital Contributions and Sharing Ratios of the Members**

| Names and Addresses of Members | Initial Capital Contributions | Sharing Ratios |
|---|---|---|
| Investors | ~$600,000 | 100% |
| **TOTALS** | | 100% |

Future investors will own 100% equity in the company. Profits will be split with investors receiving 10% annual interest preferred and after their capital has been returned they will receive 60% of all remaining profits and the remaining 40% profits will be split according [to] the Schedule 3, infra.

All Members have been informed of and expect additional members to join and make their own respective capital contributions in the upcoming days and weeks with $400,000 – $600,000 additional cash raised.

Towne and Duta both agree to execute an assignment from Lost Pines to the Company of the Property in exchange for (1) $4,000 on the day of assignment, March 1, 2018 and (2) a $100,000 deposit scheduled to be made to Towne/E3D at closing, or immediately upon receipt of those funds from investors, for services to be rendered. The remaining cash on hand in the Company will be hel[d] in reserve for taxes and expenses as the priority with the remaining to be spent to cover Towne/E3D services. If cash on hand is exhausted, E3D's expenses will be paid before profit disbursement.

Duta will personally invest at least $15,000 as an investor and will ensure the Property closes with a short-term, interest free loan to the Company while investor money comes in.

The following is the entirety of Schedule 3, as referenced in Schedule 1:

3

**Schedule 3**
**Developer Schedule**
**Schedule 2 [sic]**

**Names, Addresses, Initial Capital Contributions and Sharing Ratios of the Members**

| Names and Addresses of Members | Initial Capital Contributions | Sharing Ratios |
|---|---|---|
| Andrei Duta [address] | Cash and substantial developer/real estate services | 48.5% |
| Patrick Towne [address] | Service substantial engineering services | 48.5% |
| Devin Black [address] | Legal services | 3% |
| **TOTALS** | | 100% |

The Agreement also defines "Manager," "Member," and "Membership Interest" as

**"Manager"** means any Person that is elected to act as a manager of the Company as provided herein. "Managers" means all such Persons collectively in their capacity as Managers of the Company.

**"Member"** means the Persons listed as members on Schedule 1 of this Agreement or any successor or successors to all or part of any such Member's Membership Interest, or any Person admitted as an additional member to the Company in accordance with this Agreement and [Title 3 of the Texas Business Organizations Code], each in the capacity as a member of the Company. "Members" means all such Persons collectively in their capacity as members of the Company.

. . . .

**"Membership Interest"** means all of the rights and obligations of a Member in respect of such Member's ownership interest in the Company, including but not limited to the right to receive distributions and any obligation to make Capital Contributions under this Agreement.

4

Section 4.1 appointed Duta, Towne, and Black as the initial board of Managers (the "Board"), while also expressly stating that "Managers need not be Members." Finally, under Section 11.19 (titled "Exhibits and Schedules"), the Agreement states that "the undersigned, being the initial Managers and all of the Members of the Company have caused this Agreement to be duly adopted by the Company effective as of the date first above written." The signatures of Duta, Towne, and Black are then listed on separate lines under the titles of both "Managers" and "Members."

On March 6, 2018, the Company closed on the Property. Black and Duta later testified that it was expected at the time that Towne would make a monetary capital contribution in the Company to become a Member. The parties do not dispute that Towne did not make the monetary capital contribution. The day after closing, Black sent a letter to Towne, informing him that he had been removed as a Manager and Member of the Company.[2]

On March 8, the Agreement was amended, adding the names of specific Members, their initial capital contributions, and their preferred sharing ratios (the "Amended Agreement"). The new Schedule 1 did not list Towne as one of the members. Members listed in the Amended Agreement thereafter held a meeting and voted to remove Towne as a Manager of the Company on March 12, 2018.

Towne and E3D filed suit against Black, Duta, and the Company the following year. As of the live pleadings at the time of the summary judgment motions, Appellants asserted causes of action for fraud, fraudulent inducement, statutory fraud, breach of contract, breach of

_____

[2] Black also informed Towne that the Company's arrangement with E3D for engineering services had been terminated.

fiduciary duty, shareholder oppression, theft, conversion, tortious interference with existing contract, and conspiracy.

Towne moved for partial summary judgment on the issue of his membership in the Company, contending that the Agreement was unambiguous, that he was and is still a member of the Company, that the Amended Agreement is void, and that the March 12 meeting was invalid. The trial court held a hearing on July 14, 2021, and thereafter entered an order the next day concluding that the Agreement is unambiguous, but then also concluding that the summary judgment record establishes as a matter of law that Towne is not, and never was, a member of the Company; that the Amended Agreement is valid and enforceable; and that the March 12 meeting was valid and effective.

Duta and the Company then moved for partial summary judgment, seeking dismissal of Appellants' claims, and Black filed a separate summary judgment cross-motion also seeking dismissal. The trial court entered an order on August 16, 2021, granting both Duta and the Company's motion and Black's cross-motion. The trial court entered final judgment on September 10, 2021, ordering Appellants take nothing on their claims and stating as follows: "All relief not granted herein is denied. This is a final judgment and is appealable."[3] Appellants then filed the present appeal.

## STANDARD OF REVIEW

A summary judgment decision by the trial court is reviewed de novo. *Texas Mun. Power Agency v. Public Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007). Summary

---

[3] Contemporaneously with seeking final judgment, Duta and the Company filed a notice of nonsuit without prejudice of their counterclaim. Appellants sought to treat the nonsuit as with prejudice, but the trial court denied that request.

judgment is proper when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Tex. R. Civ. P. 166a(c); *see also Mangham v. YMCA of Austin, Tex.-Hays Cmties.*, 408 S.W.3d 923, 926 (Tex. App.—Austin 2013, no pet.). "Because the trial court's order does not specify the grounds for its summary judgment, we must affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious." *Provident Life & Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

## FINALITY OF JUDGMENT

Appellants argue that the trial court's judgment must be reversed because they still have some unadjudicated claims. They argue that the summary judgment motions did not address their breach of contract, breach of fiduciary duty, tortious interference with contract, and conspiracy causes of action. Appellate courts only have jurisdiction over appeals from final judgments and certain statutorily recognized interlocutory orders. *See, e.g.*, *B.C. v. Rhodes*, 116 S.W.3d 878, 881 (Tex. App.—Austin 2003, no pet.). Reviewing the record on appeal, the trial court entered a final judgment directing Towne and E3D to take nothing on their claims and expressly stating "All relief not granted herein is denied. This is a final judgment and is appealable." *See In re Elizondo*, 544 S.W.3d 824, 825–26 (Tex. 2018) (orig. proceeding) (explaining order is final if includes finality phrase or disposes of all claims before trial court) (citing *Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 205–06 (Tex. 2001)). Moreover, all of the causes of action referenced by Appellants were raised by Appellees in their summary judgment motions below and the trial court granted those motions in whole. Because the judgment entered

7

by the trial court in this case disposes of all the parties and issues, we overrule this issue and address the merits of the case.

## SUMMARY JUDGMENT CHALLENGES

In their other three issues on appeal, Appellants argue that (1) the trial court erroneously concluded that Towne was not a member of the Company, (2) the trial court erroneously concluded that the Amended Agreement was valid and effective, and (3) Appellants' causes of action should have survived summary judgment. We address each in turn.

### *Towne's Membership in the Company*

In his first issue, Towne challenges the trial court's conclusion that there is no genuine issue of material fact that he is not a Member of the Company. Although the parties agree that the terms of the Agreement are unambiguous, they disagree about how to interpret the relevant contractual provisions. Towne argues the trial court should have determined that he was a member because the Agreement "unambiguously designated" him a member. Appellees argue that, under the unambiguous terms of the Original Agreement, Towne never became a member because he did not make the required capital contribution.

Whether a contract is ambiguous is not determined based on whether the parties disagree about its interpretation. *See URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018).[4] "Both the presence of ambiguity and interpretation of an unambiguous contract are questions of law we review de novo using well-settled contract-construction principles." *Id.* We interpret contractual language according to its "plain, ordinary, and generally accepted meaning" unless otherwise directed by the contract itself, *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118,

---

[4] The Agreement expressly provides that it is "governed exclusively by the laws of the State of Texas."

8

121 (Tex. 1996), and "our primary objective is to ascertain and give effect to the parties' intent as expressed" in the contract, *URI*, 543 S.W.3d at 763. "To that end, we consider the entire writing, harmonizing and giving effect to all the contract provisions so that none will be rendered meaningless." *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015). "No single provision taken alone is given controlling effect; rather, each must be considered in the context of the [contract] as a whole." *Id.*

If the contract's language can be given a certain or definite meaning, the contract is not ambiguous. *Id.* "But if the contract is subject to two or more reasonable interpretations after applying the pertinent construction principles, the contract is ambiguous, creating a fact issue regarding the parties' intent." *Id.* "Summary judgment is not the proper vehicle for resolving disputes about an ambiguous contract." *Id.*

Reviewing its plain language, the Agreement unambiguously provides that the initial membership in the Company is based on making a required capital contribution. The Agreement defines "Member" as including the "Persons listed as members on Schedule 1."[5] Section 3.1 of the Agreement similarly provides that the Members were required to "contribute cash, other property, or services . . . in the amount set forth as the Initial Capital Contribution of such Member on Schedule 1"; that "each such Member agrees to make its Initial Capital Contribution"; and that the Member receives their Membership Interest "[u]pon making the Initial Capital Contribution." Schedule 1 then plainly states that "Future investors will own 100% equity in the company" and only lists the following Members:

---

[5] The "Members" definition includes also certain successor and later-admitted Members, but none of the parties argue that Towne's basis for membership was either of those categories.

| Names and Addresses of Members | Initial Capital Contributions | Sharing Ratios |
|---|---|---|
| Investors | ~$600,000 | 100% |
| **TOTALS** | | 100% |

Accordingly, under the certain and definite terms of the Agreement, a person only became a Member of, and acquires a Membership Interest in, the Company after they make a capital contribution. *See Plains Exploration*, 473 S.W.3d at 305.

Furthermore, the plain and ordinary language of Schedule 1 expressly contemplates that the initial Members would make *monetary* capital contributions. *See Heritage Resources*, 939 S.W.2d at 121; *see also Investor*, *Black's Law Dictionary* (11th ed. 2019) ("Broadly, a person who spends money with an expectation of earning a profit.").[6] Towne does not dispute that he never made any monetary capital contribution to the Company, either prior to closing on the Property on March 6, 2018, or at any other time, and therefore Towne never became a Member under the unambiguous terms of the Agreement described above.

Towne instead argues that he is a Member because Schedule 3 lists Towne as a "Member" and Schedule 1 incorporates Schedule 3. The entirety of Schedule 1's reference to Schedule 3 is as follows:

> ***Future investors will own 100% equity in the company.*** Profits will be split with investors receiving 10% annual interest preferred and after their capital has been returned they will receive 60% of all remaining profits ***and the remaining 40% profits will be split according [to] the Schedule 3, infra***.

---

[6] The Agreement does not define "Investor," and we therefore consider its plain and ordinary meaning. *See Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015).

(emphases added). Contrary to Towne's suggestion, this clause clearly distinguishes between investors, who are expressly granted "100% equity" in the Company and are listed as the initial Members under Schedule 1, and the persons listed under Schedule 3, who only have a right to specific funds *after* the investors receive their distributions. Moreover, a harmonious reading of Schedule 1 and Schedule 3 demonstrates that the sharing ratios referenced under Schedule 3 plainly direct how the "remaining 40% profits will be split" amongst the persons listed in Schedule 3. *See Plains Exploration*, 473 S.W.3d at 305.

Towne also points to Schedule 3 listing his "initial capital contribution" as "substantial engineer services" as demonstrating that he was a Member through a *non-monetary* capital contribution of services. However, we cannot read that language in isolation but must consider it in the context of the Agreement as a whole. *See id.* Both Section 3.1 and the "Members" definition expressly limit the members to those listed in Schedule 1. Schedule 1 then is titled "Investor Schedule[]" and specifies that the initial Members are the "investors" who make the specified monetary capital contributions. Schedule 3, in contrast, is labeled the "Developer Schedule" and is not referenced anywhere in the Agreement except for a single instance in Schedule 1; an instance, as previously discussed, expressly distinguished from the investors who are Members. The plain meaning of the Schedules as a whole therefore distinguishes between the investors (who are the initial Members of the Company) and the developers (who receive a portion of a special, separate payment after the investors' capital has been returned). *See id.* We must consider the Agreement as written because the parties could have drafted Schedule 1 to expressly list Towne, Duta, and Black as Members but chose not to in favor of the language actually included. *See Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017) ("A contract's plain language controls, not 'what one side or the other alleges they

11

intended to say but did not.'" (quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010))); *see also Maxey v. Maxey*, 617 S.W.3d 207, 223 (Tex. App.—Houston [1st Dist.] 2020, no pet.) ("Courts may not and will not rewrite contracts to insert provisions that the parties could have included, but did not, and that are not essential to the construction of the language of the contract."). The Agreement instead unambiguously treats developers differently than investors, and accordingly, Towne's inclusion as one of the Schedule 3 developers has no bearing on any Membership Interest he would have been entitled to as an investor under Schedule 1.

Towne also argues that his right to receive a portion of "the remaining 40% profits" as a developer under Schedule 3 constitutes a profit interest in the Company and therefore establishes he is a partial owner, citing *Vines v. Durrett*, No. 12-14-00258-CV, 2015 WL 9591525, at *5 (Tex. App.—Tyler Dec. 30, 2015, pet. denied) (mem. op.). But Towne misreads *Vines*. There, the contract was ambiguous about whether the purchaser bought a 3% ownership interest or a 3% net profits interest. *Id.* That fact issue was submitted to the jury, and the jury ultimately determined that the sale was of an ownership interest. *Id. Vines* thus does not hold that a profit interest and ownership interest are the same. Rather, the opinion does the exact opposite by recognizing the contract was ambiguous because the language could be interpreted as either a profit interest *or* an ownership interest. *Id.* But there is no such ambiguity here. The right any Schedule 3 developer may have is separate and distinct from the Membership Interest held by an investor pursuant to Section 3.1 and Schedule 1.[7]

---

[7] Towne also points to Section 4.6 of the Agreement, which confers voting rights and granted him exclusive control over engineering decisions, as being the type of voting rights that are part of a membership interest. But Section 4.6 governs the powers and voting of the managers who comprise the Board that manages and controls the affairs of the Company. Both

Finally, Towne argues that he is an initial Member because he signed the Agreement under Section 11.19 as both a Manager and Member of the Company. Towne is correct that Towne, Duta, and Black all signed the Agreement twice, once as "Managers" and once as "Members." But we must consider that section "in the context of the instrument as a whole." *Plains Exploration*, 473 S.W.3d at 305. Nothing in Section 3.1 or any other provision in the Agreement makes membership contingent on signing the Agreement. Rather, the membership-related provisions require that a person receives their Membership Interest only after making the required capital contribution. Moreover, surrounding facts and circumstances can "provide context that elucidates the meaning of the words employed" so long as that evidence does not create ambiguity which otherwise does not exist in the contract. *See URI*, 543 S.W.3d at 765; *see also First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017) ("In other words, the parol-evidence rule 'does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text.'" (quoting *Houston Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011)). Although the original purchase contract for the Property was executed in September 2017, that contract was not assigned to the Company until February 2018. The Agreement was then signed on March 1, 2018, with the Company closing on the Property approximately one week later. As Black testified in his deposition, "we had all signed an agreement saying that as soon as capital contributions were made, they would be a member" and that "since no one had made them yet, we had signed [the Agreement] as members and as managers because we anticipated that the organization would run with us in those capacities but had not yet been effectuated under the

the Agreement itself and the Texas Business Organizations Code treat Managers and Members differently. *Compare* Tex. Bus. Orgs. Code §§ 101.101–.114 (Membership), *with id.* §§ 101.301–.307 (Managers).

13

terms of that operating agreement because no capital contributions had yet been established." Such references to Towne as a "Member" on signature blocks thus do not make the Agreement ambiguous about Towne's membership, but rather demonstrate that the parties at the time believed Towne, Black, and Duta would become Members pursuant to the terms they expressly agreed to under the Agreement. *See First Bank*, 519 S.W.3d at 110. Contrary to that assumption, Towne ultimately did not make the capital contribution required under the Agreement.

Accordingly, based on the unambiguous terms of the Agreement, a party would only become an initial Member of the Company after making the monetary capital contribution required under Section 3.1 and Schedule 1. Since the parties do not dispute that Towne never made such a capital contribution, the trial court did not err in determining that he is not a Member of the Company as a matter of law. We overrule Towne's first issue.

### *Validity of the Amended Agreement and Member Meeting*

In his second issue, Towne contends that the trial court erroneously concluded the Amended Agreement was valid and effective. Towne argues that when the Agreement was amended on March 8, 2018, Appellees improperly removed Towne's membership interest and voting rights without his consent. He points to Section 11.7(a) of the Agreement, which requires that

> *any amendment or modification (a) altering any Member's share of allocations of Profits (or any item thereof) and Losses (or any item thereof) or distributions* (other than as a result of the issuance of additional Membership Interests or adjustments to Sharing Ratios as expressly permitted herein), (b) altering any Member's voting rights (other than as expressly provided herein), (c) modifying in any manner a Member's obligations to make Capital contributions, or (d) otherwise modifying the limited liability of a Member, *shall require the*

14

*consent of the Member affected thereby*.

(emphases added); *see also* Tex. Bus. Orgs. Code § 101.107 ("A member of a limited liability company may not withdraw or be expelled from the company."). Towne also argues that new membership interests cannot be issued without the approval of all members. *See* Tex. Bus. Orgs. Code § 101.105 (authorizing limited liability company to "issue membership interests in the company to any person with the approval of all of the members of the company"). However, Towne was not a Member of the Company, and therefore the Amended Agreement did not "modify" his membership interest or member voting rights because he did not have any under the original Agreement. Nor was Towne required to consent to the Amended Agreement.

Towne also argues that the March 12 meeting was invalid because Towne did not receive notice of the meeting and the minutes were not signed. Section 10.3 of the Amended Agreement, however, only required notice of meetings to be given "to each Member of record entitled to vote at such meeting." Such a notice requirement was therefore not applicable to Towne, who at the time of the meeting was only a Manager, not a Member, of the Company. Further, Towne cites to no statutory or contractual requirement for meeting minutes to be signed. Towne makes a passing reference to Section 10.8 of the Amended Agreement that actions at a meeting shall be "evidenced by written minutes thereof executed by an authorized Member," but nothing in the Agreement specifically requires a signature. *See Mid-Continent Cas. Co. v. Global Enercom Mgmt., Inc.*, 323 S.W.3d 151, 157 (Tex. 2010) ("But the word 'execute' has several definitions and is not constrained by [the party's] argument that 'to execute' may only mean 'to sign.'"). We overrule Towne's second issue.

15

***Summary Judgment on Appellants' Causes of Action***

In their third issue, Appellants argue that the trial court erred in granting summary judgment and dismissing their causes of action. They do not individually address each cause of action, but instead generally argue that the assignment was invalid, that the economic loss rule does not apply, that the merger clause in the Agreement is inapplicable, and that they generally provided sufficient evidence to create a material fact issue on "every portion" of the summary judgment motions.[8]

When the trial court does not specify the grounds on which its orders are based, "the appealing party must negate each ground upon which the judgment could have been based." *Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 226–27 (Tex. 2022); *see also Shih v. Tamisiea*, 306 S.W.3d 939, 944–45 (Tex. App.—Dallas 2010, no pet.). That is, the party must either separately address each possible ground or assert a general issue that encompasses arguments negating all possible grounds. *See Rosetta Resources*, 645 S.W.3d at 227. Without making such a showing, "the court of appeals cannot properly reverse summary judgment on those grounds." *Id., see also Shih*, 306 S.W.3d at 945 ("If an appellant does not challenge each possible ground on which summary judgment could have been granted, we must uphold the summary judgment on the unchallenged ground."). Here, Appellants challenge only the validity of the assignment, the economic loss rule, and the validity of the merger clause, which would not

---

[8] Appellants also argue that the trial court erred by considering the summary judgment motions because the trial court had previously denied a traditional summary judgment motion filed by Duta and the Company. However, "[a] trial court may, in the exercise of discretion, properly grant summary judgment after having previously denied summary judgment without a motion by or prior notice to the parties, as long as the court retains jurisdiction over the case." *Rush v. Barrios*, 56 S.W.3d 88, 98 (Tex. App.—Houston [14th Dist.] 2001, pet. denied); *see also Green v. Gemini Expl. Co.*, No. 03-02-00334-CV, 2003 WL 1986859, at *6 (Tex. App.—Austin May 1, 2003, pet. denied) (mem. op.).

negate every ground for summary judgment raised by appellees below. *See Rosetta Resources*, 645 S.W.3d at 227.[9]

Even if those specific arguments were sufficient to negate all summary judgment grounds, Appellants have failed to adequately brief them on appeal. *See LMP Austin Eng. Aire, LLC through Lafayette Eng. Partner, LLC v. Lafayette Eng. Apartments, LP*, 654 S.W.3d 265, 291 (Tex. App.—Austin 2022, no pet.) (explaining party waives argument due to inadequate briefing when it fails to properly cite record or provide meaningful argument or substantive analysis); *see also Lion Copolymer Holdings, LLC v. Lion Polymers, LLC*, 614 S.W.3d 729, 733 (Tex. 2020) (directing court of appeals to consider "the arguments, evidence, and citations relied on by those parties to determine which issues the parties intended to and ***actually*** briefed" when considering waiver (emphasis added)).

Appellants fail to cite any legal precedent or controlling law governing the validity of assignments, and although they make some references to the record on appeal, Appellants do not even cite the assignment itself, which contains Towne's signature, or their unverified pleadings. *See Rachal v. Reitz*, 403 S.W.3d 840, 845 (Tex. 2013) ("Typically, a party manifests its assent by signing an agreement."); *In re Bunzl USA, Inc.*, 155 S.W.3d 202, 209 (Tex. App.—El Paso 2004) (orig. proceeding) (explaining party's signature on written contract is "strong evidence" of unconditional assent); *see also* Tex. R. Civ. P. 93 (requiring pleading verified by affidavit when challenging the execution or genuineness of certain written instruments or failure of consideration). Appellants then summarily argue that their fraud, theft, conversion, and tortious interference causes of action are not barred by the economic loss rule in

---

[9] Appellants do not mention their dismissed causes of action for breach of contract, breach of fiduciary duty, statutory fraud, shareholder oppression, or conspiracy in this issue on appeal. *See Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 227 (Tex. 2022).

17

an argument totaling two sentences, which fails to substantively address how those causes of action "create liability outside" the Agreement. *See LMP Austin*, 654 S.W.3d at 291. Appellants then argue the merger clause in the Agreement is inapplicable without citing the merger clause itself, without citing evidence in the record, and without any substantive analysis of the relevant factors or controlling law for determining the enforceability of merger clauses. *See, e.g.*, *Transcor Astra Grp. S.A. v. Petrobras Am. Inc.*, 650 S.W.3d 462, 473–74 (Tex. 2022) (describing controlling law and relevant factors for determining whether reliance disclaimer is effective).

Finally, Appellants contend that they have shown sufficient evidence of a material fact issue on "every portion" of the summary judgment motions. *See* Tex. R. Civ. P. 166a(c). Appellants do not specify what evidence creates these ostensible fact issues or the arguments or authorities they rely upon for demonstrating a live issue on any specific cause of action. *See Lion Copolymer*, 614 S.W.3d at 733. Moreover, as we explained above, Towne is not a Member of the Company (i.e., the only issue to which Appellants devote substantial portion of their briefing). "An appellate court may not reverse a trial court's judgment without properly assigned error." *Rosetta Resources*, 645 S.W.3d at 226. Accordingly, we overrule Appellants' third issue.

## CONCLUSION

Having overruled all of Appellants' issues, we affirm the judgment of the trial court.

_____

Darlene Byrne, Chief Justice

18

Before Chief Justice Byrne, Justices Kelly and Smith

Affirmed

Filed:   October 20, 2023